[Cite as *State v. Barnett*, 2013-Ohio-2496.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,              CASE NO. 8-12-09

    v.

ROBBY B. BARNETT,               O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Logan County Common Pleas Court**
**Trial Court No. CR-08-0157**

**Judgment Affirmed**

**Date of Decision: June 17, 2013**

---

**APPEARANCES:**

    *Valerie Kunze* **for Appellant**

    *William T. Goslee and Eric C. Stewart* **for Appellee**

**ROGERS, J.**

{¶1} Defendant-Appellant, Robby B. Barnett, appeals the judgment of the Court of Common Pleas of Logan County convicting him of illegal possession of chemicals for the manufacture of drugs, illegal manufacture of drugs, and possession of drugs. On appeal, Barnett argues that the trial court erred by admitting impermissible evidence regarding the death of Jeff Aldrich ("Jeff") in an unrelated trailer fire. Barnett also claims that he was denied the effective assistance of counsel. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On September 13, 2011, the Logan County Grand Jury indicted Barnett on three counts: (1) Count I - illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041, a felony of the third degree; (2) Count II - illegal manufacture of drugs in violation of R.C. 2925.04, a felony of the second degree; and (3) Count III - possession of drugs in violation of R.C. 2925.11, a felony of the fifth degree.

{¶3} The trial of this matter commenced on June 28, 2012 and concluded the next day.

{¶4} In its opening statement, the State referred to a fire in Auglaize County at Jeff's trailer and how it led law enforcement to investigate Barnett's possible role in the manufacture of methamphetamine. However, the State

explicitly cautioned the jurors as follows regarding the Auglaize County fire: "I would like to caution you, you only have to consider what's going on here in Logan County." Trial Tr., p. 65. Barnett's counsel likewise referred to the Auglaize County fire in his opening statement. In doing so, Barnett's counsel also included a caveat for the jurors: "I would like to state we're not here for a death case. That stuff happened in Auglaize County. While tragic, that's not what you're here for."[1] Trial Tr., p. 72.

{¶5} Sergeant Doug Burke with the Auglaize County Sheriff was the first witness called to the stand. He indicated that on May 4, 2011, he responded to a fire in a trailer park near Wapakoneta. Sergeant Burke testified that the trailer was owned by Jeff, who died in the fire. According to Sergeant Burke, the fire marshal could not determine the cause of the fire and after the investigation was finished, the authorities released the scene and allowed Jeff's family members to access the trailer. Shortly after this, Jeff's sons, Jimmy ("Jimmy") and Josh ("Josh") Aldrich, went to Sergeant Burke and said that they had found suspicious materials at the trailer.

{¶6} Sergeant Burke testified that the materials were consistent with the manufacture of methamphetamine, which led the police to question Corey Reed, Barnett's nephew. Reed then gave the police information that led them to

---

[1] There is some indication in the record that the State pursued a separate indictment against Barnett in Auglaize County. However, the record before us does not include any filings that indicate the disposition of a Auglaize County prosecution.

investigate Barnett. Sergeant Burke subsequently made initial contact with Barnett, who admitted that he had been at Jeff's trailer the night of the fire to deliver food. Sergeant Burke also testified that during the initial contact, he observed burn marks on Barnett's hands.

{¶7} On cross-examination, the following relevant exchange occurred:

Q: And they [Jeff's family members] already had an opinion as to how [the fire started] when they arrived [at the Sheriff's office], did they not?

A: They?

Q: They thought they knew who did it and what the cause was.

A: Not initially, no. Trial Tr., p. 100.

Sergeant Burke also acknowledged that Jeff's family members essentially had free reign over the trailer and scene of the fire after the fire marshal released it. Further, he admitted that there was no police supervision of the family members' activities at the scene.

{¶8} The State subsequently called Jimmy to the stand. He testified that he was friends with Barnett and worked for Barnett's carpet cleaning business periodically for about 10 years. Jimmy said that he contacted the Auglaize County Sheriff because "we had noticed that there was some odd looking things in the house that didn't seem right. * * * [I]t looked like there was some type of illegal activity going on * * *." Trial Tr., p. 140. According to Jimmy, Barnett asked

several members of Jeff's family, including Jeff himself, to purchase Sudafed for him. Jimmy also indicated that Barnett had previously provided him with methamphetamine.

{¶9} Jimmy said that there were two fires in Barnett's residence and that one time, the fire severely burned Barnett's face. The following exchange occurred regarding this fire:

Q: Did you ask [Barnett] what had happened?

A: Yeah. And he quoted, "yeah, the s[---] took off and blew up in my face."

Q: What did you take that to mean?

A: That he was cooking meth and it blew up in his face. Trial Tr., p. 143-44.

{¶10} On cross-examination, Barnett's trial counsel elicited testimony regarding Jimmy's beliefs about the cause of the fire at Jeff's trailer. The pertinent colloquy proceeded as follows:

Q: Okay. Now, I think part of what's going on is you believe that [Barnett] had something to do with your father's death; is that true?

A: Absolutely.

Q: Okay. And you knew that the Fire Marshall had stopped his investigation, didn't see it that way; is that true?

A: I don't know.

Q: You weren't happy with what the Fire Marshall was saying, you decided that you needed to contact the authorities yourself, you and your brother and your sister?

A: No, I don't believe that's how that went. Trial Tr., p. 47-48.

{¶11} Josh also testified. Like his brother, Josh was a periodic employee of Barnett's carpet cleaning business. He testified that as part of his duties, he often had to buy Coleman camping fuel for Barnett, which he said was odd because Barnett did not camp. Josh also indicated that he purchased Sudafed for Barnett and saw him smoke methamphetamine.

{¶12} Josh testified that when he went to the trailer after the fire, he saw "several possessions of [Barnett's] throughout the house, a lot of his chemicals and the things that he uses." Trial Tr., p. 152. Finding these items "tipped [him] off that, you know, [Barnett] was definitely involved in some fashion with the fire." Trial Tr., p. 153. After discovering these materials, Josh gathered them and provided them to the Auglaize County Sheriff.

{¶13} On cross-examination, Josh testified as follows regarding his personal anger towards Barnett:

Q: Okay. So did it seem – it seemed weird to you, did it not, that you couldn't get ahold of [Barnett, Jeff's] close friend when you were trying to get ahold of him and tell him that your father had passed.

A: Absolutely.

Q: And it had to be very frustrating, was it not, that you couldn't get ahold of him?

A: Yeah, it was very frustrating.

Q: And, in fact, you at some point, maybe because of the way he acted or interpreted what you were saying to him, you might have gotten angry that he wasn't around; is that true?

A: I was – I was a little irritated, yes. Trial Tr., p. 163.

To rehabilitate Josh, the State elicited testimony on redirect examination as follows:

Q: What do you believe [Barnett] did [to harm the relationship]?

A: I believe he was basically the instigator of what happened at my father's house that night.

Q: [Barnett's counsel] wants to imply that you were trying to get back at him for that. Have you done anything, plant any evidence, to try and get back at [Barnett]?

A: No, sir. Trial Tr., p. 165.

{¶14} Custodians of records for Wal-Mart, CVS, and Rite Aid testified as to Barnett's purchases of Sudafed, which contains pseudoephedrine, in stores throughout Ohio and Indiana. According to the custodians' testimonies and the documents they provided, Barnett purchased approximately 300 tablets over a two-year span in 2010 and 2011. On cross-examination, the custodians acknowledged that Barnett's purchases did not cause any of their stores to flag Barnett as barred from buying additional pseudoephedrine-containing drugs.

{¶15} Investigator Kim Reiher of the Grand Lake Drug Task Force testified regarding the execution of a search warrant on May 17, 2011 at Barnett's residence in Logan County. She indicated that she was present when officers took pictures of Barnett's burnt hands and went with him to the hospital, where blood and urine samples were collected from him. As part of Investigator Reiher's testimony, the State introduced three pictures of Barnett's burnt hands into evidence. On cross-examination, Investigator Reiher indicated that the purpose of taking the pictures was to possibly pursue a case in Auglaize County.

{¶16} Deputy Michael Voorhees of the Auglaize County Sheriff's Office also testified as to the police's search of Barnett's residence in Logan County. He indicated that the officers found black soot in the bathroom of the residence which was consistent with Jimmy's testimony that there were previous fires at Barnett's residence. Deputy Voorhees additionally found the following: (1) a Wal-Mart receipt showing the purchase of Coleman camping fuel; (2) a paper plate in the oven that had a "green vegetative" material on it, trial tr., p. 173; (3) respirators; (4) a "spent fire extinguisher," trial tr., p. 174; (5) rubber gloves with black soot on them; (6) mason jars and a funnel that were found under the bathroom sink; (7) a partially melted mouthwash bottle; (8) coffee filters with white powder on them, which was found to be pseudoephedrine after chemical testing; (9) lye drain cleaner; (10) a paper plate with aluminum foil and straw that had white power on

it, which was found to be methamphetamine residue after chemical testing; and (11) aluminum foil with burn marks.

{¶17} On cross-examination, Deputy Voorhees testified that all of the discovered materials could be used for legal purposes, except for the methamphetamine residue on the paper plate, and that many people have them in their residences. However, on redirect examination, he indicated that it was unusual that the drain cleaner was found in Barnett's closet. Deputy Voorhees also testified that pseudoephedrine is not usually found in crushed white power form.

{¶18} Forensic scientists Megan Snyder and Dr. Travis Worst of the Ohio Bureau of Criminal Identification and Investigation ("BCI & I") testified regarding the tests that they performed on the white power collected from Barnett's residence. They found that the powder contained pseudoephedrine and methamphetamine residue.

{¶19} The State's last witness was Special Agent Scott Duff of BCI & I. He was offered as an expert on the manufacture of methamphetamine and discussed at length the "shake and bake method" of "cooking meth." Trial Tr., p. 244. The process uses pseudoephedrine, which is derived from Sudafed, and Coleman camping fuel as an accelerant. According to Agent Duff, the process is highly volatile and fires or explosions occur quite frequently. The manufacture of

methamphetamine also involves the use of mason jars, funnels, aluminum foil, and coffee filters. Based on the items discovered at Barnett's residence and his knowledge of the typical cooking process, Agent Duff opined that they were being used to manufacture methamphetamine.

{¶20} On cross-examination, Agent Duff acknowledged that the discovery of the items did not necessarily indicate that the methamphetamine was manufactured at Barnett's residence. He also admitted that it was possible that someone besides Barnett could have placed the materials at the residence.

{¶21} After Agent Duff's testimony, the State rested. Barnett offered the testimony of Robby Strickland, one of his house guests, who indicated that he did not suspect that Barnett was manufacturing methamphetamine at his Logan County residence. Barnett offered no other witnesses and rested.

{¶22} The jury found Barnett guilty on all three counts alleged in the indictment. The trial court merged Barnett's convictions on Counts I and II for the purposes of sentencing and the State elected to proceed on Count II. Consequently, on August 13, 2012, the trial court sentenced Barnett to five years on Count II and 12 months on Count III with the sentences ordered to be served concurrently.

{¶23} Barnett timely appealed his convictions, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED WHEN IT ADMITTED IRRELEVANT AND PREJUDICIAL EVIDENCE ABOUT THE DEATH OF MR. ALDRICH AND THUS DENIED ROBBY BARNETT HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL. OHIO EVIDENCE RULE 401, 403(A), 404(B), R.C. 2945.59, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.**

*Assignment of Error No. II*

**TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION. *STATE V. WASHINGTON*, 466 U.S. 668, 104 S.CT. 2052 (1984).**

*Assignment of Error No. I*

**{¶24}** In his first assignment of error, Barnett contends that his convictions should be reversed because the evidence of the fire that killed Jeff was improperly admitted under Evid.R. 401, 402, 403(A), and 404(B) as well as R.C. 2945.59. We disagree.

*Standard of Review*

**{¶25}** Barnett failed to object to any of the challenged evidence at trial. Accordingly, he has waived all but plain error. *State v. Bump*, 3d Dist. No. 8-12-04, 2013-Ohio-1006, ¶ 81. To have plain error under Crim.R. 52(B), the error must be an "obvious" defect in the trial proceedings that affected the defendant's

"substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* Further, plain error only exists where "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431 (1997).

*Relevance Under Evid.R. 401 and 402*

{¶26} Evid.R. 402 provides that relevant evidence is generally admissible unless the Rules of Evidence or other law provides to the contrary. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." These provisions produce a low threshold of admissibility, which "reflect[s] the policy favoring the admission of relevant evidence for the trier of fact to weigh." *State v. Kehoe*, 133 Ohio App.3d 591, 606 (12th Dist. 1999).

*Other Acts Evidence Under R.C. 2945.59 and Evid.R. 404(B)*

{¶27} Satisfaction of Evid.R. 401 and 402 does not end our inquiry, however, since both R.C. 2945.59 and Evid.R. 404(B) operate to bar otherwise relevant evidence. *See State v. Grubb*, 111 Ohio App.3d 277, 280 (2d Dist. 1996) ("Character evidence is generally excluded not because it lacks relevancy, but because its probative value is substantially outweighed by the danger of unfair

prejudice."); *State v. Bell*, 145 Ohio Misc.2d 55, 2008-Ohio-592, ¶ 23 (C.P.) ("[Evid.R. 404(B)] deal[s] with the exclusion of otherwise relevant evidence."). These provisions generally proscribe the admission of evidence of other bad acts for the purpose of showing the defendant's propensity to commit crimes or that he acted in conformity with negative character traits. *See State v. Jaimson*, 49 Ohio St.3d 182, 183 (1990) ("Under longstanding principles of Anglo-American jurisprudence, an accused can not be convicted of one crime by proving he committed other crimes or is a bad person."). However, both R.C. 2945.59 and Evid.R. 404(B) allow for various contexts in which other acts evidence is admissible.

{¶28} R.C. 2945.59 allows such evidence if offered to show the defendant's "motive or intent, the absence of mistake or accident * * *, [or] the defendant's scheme, plan, or system in doing an act * * *." Evid.R. 404(B) similarly provides for other acts evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See also State v. Darrington*, 6th Dist. No. WD-07-019, 2008-Ohio-3269, ¶ 13 ("When other acts demonstrate criminal conduct, they should be so blended or connected with the act on trial that proof of one incidentally * * * explains the circumstances [of the charged crimes]."), citing *State v. Roe*, 41 Ohio St.3d 18, 23-24 (1989). The Supreme Court of Ohio has harmonized its interpretation of R.C. 2945.59 and

Evid.R. 404(B), *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, syllabus, and has noted that Evid.R. 404(B) "afford broad discretion to the trial judge regarding the admission of other acts evidence," *id.* at ¶ 17. Still, both the statute and the rule "must be strictly construed against admissibility." *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 67 (12th Dist.), citing *State v. Broom*, 40 Ohio St.3d 277, 281-82 (1988).

*Unfair Prejudice Under Evid.R. 403(A)*

{¶29} Even if evidence crosses the low threshold of relevance and the dictates of R.C. 2945.59 and Evid.R. 404(B), the evidence may still be inadmissible where "its probative value is substantially outweighed by the danger of unfair prejudice * * *." Evid.R. 403(A). In *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169 (2001), the Supreme Court of Ohio outlined the contours of "unfair prejudice" as follows:

> "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." *Id.* at 172, quoting Weissenberger, *Ohio Evidence*, Section 403.3, 85-87 (2000).

*Challenged Evidence*

**{¶30}** Barnett complains of the following evidence regarding the fire that killed Jeff: (1) Sergeant Burke's testimony regarding the investigation of the fire; (2) Reiher's identification of the pictures showing Barnett's burnt hands; and (3) Jimmy's and Josh's testimony regarding the fire.[2] We now turn to addressing each of these items.

*Sergeant Burke's and Reiher's Testimony*

**{¶31}** Sergeant Burke testified regarding his investigation of the fire that killed Jeff and how it led the police to focus on Barnett as a possible manufacturer and distributor of methamphetamine. Meanwhile, in Reiher's testimony, she identified three pictures showing Barnett's burnt hands that were admitted into evidence. On cross-examination, Reiher indicated that the pictures were taken for the purpose of pursuing a case in Auglaize County.

**{¶32}** In applying the low threshold of Evid.R. 401 and 402, Ohio courts have previously found that evidence relating to the police's investigation of a criminal defendant is relevant and admissible. *E.g.*, *State v. Trent*, 5th Dist. No. 2004CA00360, 2005-Ohio-5793, ¶ 18 (implicitly finding that police officer's testimony was admissible since it "was offered merely to explain police

---

[2] Barnett also complains of the prosecutor's references to the fire during his opening and closing statements. However, such references were argument, not evidence. *State v. Clay*, 181 Ohio App.3d 563, 20009-Ohio-1235, ¶ 45 (8th Dist.). Consequently, Barnett cannot complain of the references' purported inadmissibility. To challenge these references, Barnett should have brought a prosecutorial misconduct challenge. Since he has not done so, we are compelled to disregard Barnett's identification of the prosecutor's references to the fire as impermissible evidence. App.R. 12(A)(2).

investigative behavior"); *State v. Bailey*, 8th Dist. No. 81498, 2003-Ohio-1834, ¶ 27-29 (implicitly finding that police officer's testimony regarding the investigation of the defendant was relevant since it "was necessary to explain" events leading to the defendant's arrest); *State v. Payne*, 8th Dist. No. 66214 (Oct. 20, 1994) ("Such background information [regarding the police's investigation] provides the jury with a view toward the setting of the case and is relevant [to the charged crimes].").  Ohio courts have also found that such evidence overcomes the bars of R.C. 2945.59 and Evid.R. 403 and 404(B).  *E.g.*, *Trent* at ¶ 18; *Bailey* at ¶ 27-29.  However, courts have also recognized that providing extensive testimony regarding a prosecution's background may be excluded where it is unfairly prejudicial or otherwise contrary to the Rules of Evidence.  *See State v. Nichols*, 10th Dist. No. 97APA09-1162 (May 5, 1998) ("Although a certain amount of background information is generally admissible in order to give the jury the 'setting' of the case, * * * the evidence offered in this matter far exceeded that threshold.").

{¶33} Some of the evidence regarding the investigation of the Auglaize County fire may have been admissible since it identified the background of the indictment and the evidence that led police to investigate Barnett in Logan County.  But, Sergeant Burke's and Reiher's testimony focused extensively on Barnett's activities in Auglaize County and went beyond the scope of what was

permissible background information. Since the indictment charged Barnett with violating Ohio law in Logan County, the references to the Auglaize County fire were of minimal relevance. Nevertheless, the State elicited testimony that seemingly implicated Barnett as being involved in setting the fire and causing Jeff's death. Such evidence was calculated to strike at the jurors' "instinct for punishment," *Oberlin*, 91 Ohio St.3d at 172, and it is plainly the type of character evidence that the Rules of Evidence are meant to exclude in prosecutions for mere drug offenses, *compare State v. Satta*, 3d Dist. No. 9-01-38, 2002-Ohio-5049, ¶ 39 (finding that the admission of evidence indicating that the defendant used illegal drugs was outside confines of Evid.R. 404(B) since the defendant was charged with aggravated murder, burglary, kidnapping, and rape).

{¶34} As such, the evidence of Barnett's potential role in the Auglaize County fire was impermissible other acts evidence. Further, the evidence's minimal relevance was easily outweighed by the unfair prejudice that inherently comes when the State elicits testimony that implicates a defendant in an unrelated, uncharged death. Consequently, the State should not have offered the evidence and it should not have been admitted.

{¶35} Despite the inadmissibility of Sergeant Burke's and Reiher's testimony regarding the Auglaize County fire, we find that its admission was not plain error. The record reveals that the State presented overwhelming evidence to

establish the elements of the crimes charged in the indictment. The State elicited testimony regarding Barnett's purchases of large quantities of pseudoephedrine-containing medications. It also elicited testimony from Jimmy and Josh that Barnett asked them, and other members of their family, to purchase pseudoephedrine-containing medications.

{¶36} Even more critically, the State offered testimony from investigating police officers and documentary evidence regarding the materials seized from Barnett's residence. The officers found Coleman camping fuel, lye, respirators, plastic bottles with tubes coming out of them, coffee filters with white powder on them, and aluminum foil with burn marks. The forensic scientists from BCI & I testified that the white power was pseudoephedrine and that the aluminum foil contained methamphetamine residue. Agent Duff also provided expert testimony regarding the methamphetamine manufacturing process and opined that the materials found in Barnett's residence were being used for such manufacturing.[3]

{¶37} The above evidence was more than sufficient for the jury to find Barnett guilty of the crimes charged in the indictment. As a result, the admission of Sergeant Burke's testimony, the pictures of Barnett's hands, and Reiher's

---

[3] The only contradictions of this evidence were (1) the acknowledgments by the State that the mere possession of the materials seized from Barnett's residence is not criminal; and (2) the meager testimony of Strickland.

testimony about them did not affect Barnett's "substantial rights."[4] *See Satta*, 2002-Ohio-5049, at ¶ 39 (finding that improper admission of other acts evidence was not plain error since there was "overwhelming physical evidence" to support guilty verdicts on charged crimes); *State v. Newcomb*, 3d Dist. No. 8-01-07 (Nov. 27, 2001) (finding that admission of other acts evidence was harmless when "a review of the record reveals substantial other evidence supporting the guilty verdict").

### *Jimmy's and Josh's Testimony*

**{¶38}** Jimmy and Josh essentially testified that they believed Barnett was involved in the Auglaize County fire and the death of their father, Jeff. This evidence was improper under R.C. 2945.59 and Evid.R. 403(A) and 404(B) for the same reasons that Sergeant Burke's and Reiher's testimony was inadmissible. Nevertheless, despite the impropriety of the evidence, we find that its admission was invited error. It is axiomatic that "a criminal defendant may not make an affirmative, apparently strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error." *State v. Dorr*, 8th Dist. No. 84433, 2005-Ohio-775, ¶ 7. The doctrine of invited error stems from this axiom and "holds that a litigant may not 'take advantage of an error which he himself invited or induced.'" *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting

---

[4] Further, both the prosecutor and Barnett's defense counsel said during their opening and closing statements that the jurors need not consider the Auglaize County fire when deciding Barnett's guilt in this matter.

*Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus. Ohio courts have typically found invited error "when a party introduces inadmissible evidence * * * [by] elicit[ing] extensive testimony about prior crimes on cross examination." *State v. Eichelbrenner*, 1st Dist. No. C-110431, 2013-Ohio-1194, ¶ 16; *see also State v. Myers*, 9th Dist. No. 25737, 2012-Ohio-1820, ¶ 14 (finding invited error where "the testimony surrounding the underlying facts of the earlier case was elicited on cross examination by defense counsel").

{¶39} The opening statement of Barnett's trial counsel included the following pertinent argument:

> What I want to caution you – and I think the evidence will show someone here has an axe to grind. Someone here has a vendetta against [Barnett].
> I would submit that the evidence will show that the people that have the axe to grind are the people that lost their loved one in that fire. And they're the ones that generated the investigation and started the police on their investigation and led them that way. We believe the evidence will show that they had access and they had knowledge about methamphetamines and that the evidence will show that it was them and not [Barnett] that committed the crimes. Trial Tr., p. 74-75.

According to this statement, Barnett's theory of the case was that Jimmy and Josh had a "vendetta" against him and sought to implicate him in the manufacture of methamphetamine. To further develop this theory, Barnett sought to establish Jimmy's and Josh's motive for the vendetta. As such, Barnett was the first to

elicit testimony regarding the beliefs of Jeff's sons as they relate to the fire, Jeff's death, and Barnett's alleged role.

{¶40} Barnett questioned Sergeant Burke, the State's first witness, as follows on cross-examination:

Q:   And [Jimmy and Josh] already had an opinion as to how [the fire started] when they arrived [at the police station], did they not?

A:   They?

Q:   They thought they knew who did it and what the cause was.

A:   Not initially, no.  Trial Tr., p. 100.

Barnett also initiated the following exchange with Jimmy on cross-examination:

Q:   Okay.  Now, I think part of what's going on is you believe that [Barnett] had something to do with your father's death; is that true?

A:   Absolutely.  Trial Tr., p. 147.

By being the first to broach the topic of the beliefs of Jimmy and Josh as to Barnett's role in the fire and Jeff's death, Barnett opened the door and invited any error relating to the admission of this evidence.  Further, the admission of Jimmy's and Josh's beliefs did not constitute plain error.  As discussed above, the State offered a significant amount of properly admissible evidence regarding the charged crimes.

{¶41} In sum, Sergeant Burke's, Reiher's, Jimmy's, and Josh's testimony regarding the Auglaize County fire was not admissible.  Still, the admission of the

testimony was not plain error and the admission of Jimmy's and Josh's testimony was invited by Barnett. As such, no reversible error arose from the erroneous admission of this evidence.

**{¶42}** Accordingly, we overrule Barnett's first assignment of error.

**{¶43}** Although we find no plain error to Barnett in the admission of the above evidence, we are compelled to note that the State's extended focus on the Auglaize County fire was entirely unnecessary, even to provide the relevant background for the indictment. As conceded by the State at oral argument, the State simply needed to elicit testimony that there was an unrelated incident in Auglaize County that led the police to investigate Barnett for possible methamphetamine production. The State further compounded its errors by referring to the "loss" experienced by Jimmy and Josh and the negative effects caused by the manufacture of methamphetamine during its closing argument. Although these errors are glaring, we nevertheless find that they did not taint the fairness of Barnett's trial to the point of reversible error.

*Assignment of Error No. II*

**{¶44}** In his second assignment of error, Barnett argues that the trial court's judgment should be reversed because he was denied the effective assistance of counsel. Specifically, Barnett contends that his trial counsel was ineffective since

he did not object to any of the evidence about the fire that killed Jeff. We disagree.

*Ineffective Assistance of Counsel Standard*

**{¶45}** An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Id*. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), superseded by constitutional amendment on other grounds as recognized by *State v. Smith*, 80 Ohio St.3d 89, 103 (1997). Further, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone*, 2d Dist. No. 10564 (Dec. 13, 1989). "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" *Id*., quoting *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661 (1986).

*Counsel's Purported Errors*

**{¶46}** Ineffective assistance of counsel does not exist where the complained-of conduct was the result of trial counsel's tactical and strategic decisions. *See State v. Newsome*, 3d Dist. No. 12-12-03, 2012-Ohio-6119, ¶ 50 ("Debatable trial tactics, without more, will not be grounds for a claim of ineffective assistance of counsel."); *State v. Wells*, 11th Dist. No. 2011-A-0073, 2012-Ohio-4459, ¶ 92 ("Strategic and tactical decisions fall squarely within the scope of professionally reasonable judgment."). Further, when considering trial counsel's tactical decisions, courts are expected to exercise a high degree of deference. *See Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527 (2003) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable*."). After reviewing trial counsel's performance in this matter, we believe that his decision to not object to evidence of the Auglaize County fire was part of a reasonable trial strategy. As discussed above, Barnett sought to establish that Jimmy and Josh had a vendetta against him and sought to wrongfully implicate Barnett in the manufacture of methamphetamine. To show this vendetta, Barnett had to establish that Jimmy's and Josh's motive was to retaliate against him since they believed he was involved in Jeff's death. Although this strategy was of debatable merit, we are not in a position to second-guess it or to label it unreasonable. Indeed, it was perhaps the

only strategy available to the defense. Further, as noted above, the State offered significant evidence to establish the elements of the crimes charged in the indictment. As a result, trial counsel's performance in this regard did not affect the outcome of the trial.

{¶47} Accordingly, we overrule Barnett's second assignment of error.

{¶48} Having found no error prejudicial to Barnett, in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs.**

**SHAW, J., concurs in Judgment Only.**

**/jlr**