[Cite as *State v. Reed*, 2014-Ohio-644.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
WYANDOT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,            CASE NO. 16-13-11

v.

DAVID E. REED,                       O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Wyandot County Common Pleas Court
Trial Court No. 13-CR-0002

Judgment Affirmed

Date of Decision: February 24, 2014

APPEARANCES:

    *Randy F. Hoffman* for Appellant

    *Douglas D. Rowland* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, David Reed, appeals the judgment of the Court of Common Pleas of Wyandot County convicting him of two counts of rape and one count of gross sexual imposition and sentencing him to 25 years to life in prison.  On appeal, Reed argues that the trial court erred by: (1) denying his motion for acquittal at the end of the State's evidence; and (2) entering a guilty verdict that was against the manifest weight of the evidence.  Reed also contends that he was denied effective assistance of counsel.  For the reasons that follow, we affirm the trial court's judgment.

{¶2} On January 9, 2013, the Wyandot County Grand Jury returned an indictment against Reed charging him with two counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree and one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree.

{¶3} A jury trial was held in this matter on August 21, 2013.  The following relevant evidence was adduced during the State's case-in-chief.

{¶4} The first witness to testify for the State was M.R.  He testified that he is currently 15 years old and his birthday is in August, 1998.  M.R. stated that Reed is his grandfather on his father's side.  He also stated that he lived in Reed's basement from 2005 to 2008 or 2009 in Wyandot County with his father and his mother.

{¶5} M.R. stated that sometimes he would sleep in Reed's bed with him. M.R. then stated:

> A: Well, [Reed] pulled down my pants and – well, PJs, of course. And he got something from his, like suitcase or something, and, well, he stuck it up my butt. And, well, he told me that if I told anybody – before that, he said that it was God's fault. He did it to me because I was a bad child. And he said if I told anybody, that I would be in severe trouble.
>
> Q: Do you remember how old you were when this happened [M.R.]?
>
> A: Well, not a specific time. It was when I was about ten. But before that, it would be from seven to ten.

Trial Tr., p. 93-94. M.R. described the object that was inserted inside of him as being made of metal, silver and shiny, and the size of a pencil. *Id*. at 95. The suitcase that the object was kept in was described as being black with gold locks on it and "something that a lawyer would have." *Id*. M.R. then made an in-court identification of Reed.

{¶6} On cross-examination, M.R. was asked why he waited four years to tell anyone about what had happened, and M.R. replied that Reed had begun doing the same thing to his younger brother. M.R. and Reed's defense counsel then had the following exchange:

> Q: Isn't it true that this came about after your mom and your dad were fighting over where you were going to live?
>
> A: Yea, I guess. Sort of.

Q: Isn't it true that you and our mom had discussed this prior to reporting anything?

A: Yes.

Q: And at that time, you were living at your father's correct, with your father?

A: Yes.

Q: Isn't it true that your mom is the one who wanted you to tell somebody about this?

A: Yes.

* * *

Q: And since you've been living with your mom, excuse me -- before you moved in with your mom, you and your mom discussed what you were going to say, correct?

A: No. I just told them the truth.

Q: You and your mom discussed what you were going to say when you went and told somebody, correct, whether it was Children Services or a police officer, correct?

A: They just told me to tell the truth.

Q: Okay. Your mom didn't talk about what you were going to say?

A: No.

*Id*. at p. 99-100.

{¶7} Reed then asked "[i]sn't it true that it's not Mr. Reed who actually did this to you, it was Mark Reed, your father?" *Id*. at p. 101. M.R. replied that both his father and Reed would insert objects inside of him. *Id*.

{¶8} M.R.'s mother, Virgy Gault, then testified for the State. Gault stated that she moved to Sycamore to live with Reed in early February of 2005 and left in 2007 when she separated from her husband, Mark Reed. When she lived in Sycamore, Reed and his wife lived upstairs while she lived in the basement with Mark and their children. While Gault moved out in 2007, her children stayed at Reed's residence until the end of the 2008-2009 school year. Once Gault learned of the allegations M.R. made against Reed, she called the police department. Gault also denied making up these allegations in order to gain custody of her children.

{¶9} Gault testified that M.R. is "struggling a lot with everything going on." *Id*. at p. 108. She explained that M.R. has become emotional and sensitive and has mentioned suicide a couple of times. She also testified that in 2009, M.R. "started have sexual expressions that he should not have been having at that age." *Id*. at p. 110. Gault testified that M.R. was "caught putting a pencil up his butt" in 2010. *Id*. at p. 111. After Gault separated from Mark, she had visitation with their children every other weekend. Gault testified that she obtained custody of

her children in September of 2012, after M.R. made these allegations against Reed.

{¶10} On cross-examination, Gault denied discussing these allegations after the custody dispute arose and stated that "[t]hese allegations are the reason that the custody issue arose." *Id*. at p. 113-14. She also denied telling M.R. what to say to Children Services. Gault testified that there is a case pending in Seneca County for custody of her children.

{¶11} J.P. was the next witness for the State. He testified that his birthday is November 19, 1998. J.P. stated that he knew Reed from Boy Scouts and that Reed was his Scout leader.

{¶12} J.P. stated that in the Summer of 2011, when we was twelve years old, he and Reed went to Scout Village, located in Wyandot County, to paint a shed. Once they were done painting, J.P. went swimming in the pond. After J.P. was done swimming, he took his boxers off so they would dry. Reed then told J.P. he needed to check him for leeches and began touching and rubbing J.P. When asked where Reed touched and rubbed J.P., he replied "down by my balls." *Id*. at p. 130. J.P. testified that Reed did not look for leeches anywhere else on his body. The touching and rubbing lasted for about five minutes. Reed stopped touching and rubbing J.P. once other campers pulled into Scout Village.

{¶13} J.P. testified the next day after the pond incident Reed hurt him again. J.P. went over to Reed's house to mow his yard. After mowing Reed's yard for about an hour and a half, J.P. went inside Reed's house to get a drink of water. J.P. then testified that Reed held him down and "touch[ed] me down by my butt and rubb[ed] his penis all over me." *Id*. at p. 139. J.P. stated:

A: He rubbed it on me. Then he stuck something in me.

Q: He stuck something in you?

A: Yes.

Q: Okay. Where did he stick it in you?

A: My butt.

Q: Okay. Do you know what it was that he stuck in your butt?

A: No.

Q: Do you know what it felt like?

A: It was smooth.

Q: It was smooth. Okay. Do you know if it was his penis that he stuck in your butt?

A: It wasn't.

Q: It wasn't?

A: No. It was something that looked like a fake penis.

Q: Something that looked like a fake penis. Do you remember how big it was?

A:   No.

Q:   Do you remember what color it was?

A:   It was white.

Q:   It was white.  What else happened?

A:   He was masturbating.

* * *

Q:   Okay.  How long did this happen, [J.P.]?

A:   A good fifteen minutes.

* * *

Q:   This went on for about fifteen minutes.  Do you remember what happened after that?

A:   Yeah.

Q:   What happened?

A:   He ejaculated and he came on my butt.

Q:   Did he ever stick his penis in you, [J.P.]?

A:   No.

*Id*. at p. 140-42.

{¶14} After this incident occurred, Reed took J.P. outside and hit him with a stick and said "if I told anybody, he was going to hurt me more than he already did." *Id*. at p. 143.   J.P. stated that these two incidents happened in September of 2011.  J.P. stated that he quit the Boy Scouts after he went to a Boy Scout camp

and got tied to a tree by another Boy Scout.  J.P. stated that this happened after Reed touched him.   J.P. was never asked to make an in court identification of Reed.

{¶15} On cross-examination, J.P. stated that he was frequently bullied by other Boy Scouts.   J.P. went to Reed to report the bullying, but Reed told him that "boys will be boys[.]"  J.P. admitted that he was not happy with Reed's response and that he and his mom went to the police about the bullying, but the police couldn't do anything about it.  J.P. also testified:

Q:   That made you more mad, didn't it?

A:   Yeah.

Q:   You told them you wanted people to get in trouble, didn't you?

A:   Yeah.

Q:   You wanted Mr. Reed to get in trouble, didn't you?

A:   Yes.

*Id*. at p. 148.

{¶16} J.P. also denied speaking about the allegations with M.R.   J.P. admitted that the first time he was interviewed by Wyandot County Children Services he did not make any allegations against Reed.  Further, J.P. stated:

Q:   Isn't it true, at that second interview, the allegation you made was the allegation from the Boy Scout camp?

A:   No.  I made more.

Q:   Okay.  You know that one is recorded, as well, correct?

A:   Yeah.

Q:   So if we were to view that video, you would have said something on that video then?

A:   If you view that video, there is going to be everything I just told you.

Q:   Okay.  Isn't it true that you never made an allegation about Mr. Reed sticking something up your butt until after you spoke to [M.R.]?

A:   No.  That's not true.  I never spoke to him about this.

Q:   Isn't it true that your story even changed today?  When you were interviewed by any of those three people, did you ever make any statements about leeches on your body?

A:   Yeah, but there were none on there.  I made the statement that he was checking me for leeches.

Q:   Two of those interviews were recorded.  On two of those interviews, you never made a statement about leeches, did you?

A:   Yes, I did.

Q:   And isn't it true when you were interviewed in Toledo, you didn't say he stuck a fake penis up your butt.  You said he stuck his penis up your butt, didn't you?

A:   No.  I said he stuck a fake penis in my butt.

*Id.* at p. 150-52.

{¶17} Detective Kerwin Wiseley from the Wyandot County Sheriff's Office then testified for the State.  He testified that J.P.'s allegation that he was

tied to a tree at a Boy Scout camp was originally reported to the Wyandot County Sheriff's Office on July 16, 2011. *Id.* at p. 157.

{¶18} At the close of the State's evidence, Reed moved for a Crim.R. 29 motion for acquittal, which the trial court denied. During Reed's case-in-chief, the following relevant evidence was adduced.

{¶19} Reed testified that in 2009, he lived in Sycamore, Ohio with his wife, son, daughter-in-law, and their children, M.R., A.R., and V.R. Reed denied ever being alone with M.R. in his house. Reed replied that "[t]here was always somebody around[.]" *Id.* at p. 163. Reed stated that M.R. never slept in his bedroom. Reed did admit to owning a briefcase with gold locks on it. He stated that he used an attaché case and kept his "Boy Scout stuff in it." *Id.* at p. 164. Reed stated that he carried it to all his Boy Scout meetings. He denied ever touching M.R. inappropriately or touching M.R. with any inappropriate objects.

{¶20} Reed testified that he was in the Boy Scouts since 1986. Reed stated that he and J.P. would spend time together at Scout Village. Reed stated that he and J.P. were fixing up a shed in Scout Village and J.P. wanted to go swimming in the pond. When Reed told him it was time to go, J.P. got out of the water, went to the passenger side of his truck, and changed his clothes. Reed stated that he was on the driver's side of the truck. Reed denied ever having any conversation with J.P. about leeches and testified that he never touched J.P. inappropriately.

{¶21} Reed also confirmed that J.P. did come to his house the next day. He stated his wife was present. He stated that J.P. sat down in his family room and watched a video. Reed testified that he and J.P. did not do any chores that day and that he was watching J.P. until his mother got home from work. He stated that J.P. was only at his house for a half hour. Reed denied ever being alone with J.P. on that day and stated that his wife was present the entire time.

{¶22} Reed also offered testimony that J.P. had gotten in trouble with his grandmother and that he spanked J.P. as a punishment on one occasion. Reed stated:

> So then I went out and got [J.P.]. I took him back out to the house --
> or out to the house that night so he could spend the night. We went
> outside. I used -- I paddled him, because I was asked to do that. I
> used my hand. I did not use a stick or beat him with anything else. I
> used my hand. I explained to him, I said, I will never hit you with a
> stick, or a belt, or anything like that. I'm using my hand.
>    I probably whacked him three or four times, maybe five. Then
> we went back in the house. He had his clothes on at that time. I had
> all of my clothes on. We went back in the house. He went into the
> guest bedroom and went to bed. I went into my bedroom and went
> to bed. At no time did I have any other contact with him.

*Id*. at p. 172-73.

{¶23} When asked about what happened to J.P. at the Boy Scout camp, Reed replied that he was not there when it happened but learned about the incident later. He stated the Hancock County Sheriff's Office contacted him and was investigating the incident. Reed testified that he cooperated with their

investigation. When asked whether J.P. got mad over how he handled the situation, Reed replied, "I don't think [J.P.] got as mad at me that much as his mother did. I had to follow what the [Boy Scout Association] told me to do, and I cooperated with Hancock County." *Id.* at p. 176.

{¶24} On cross-examination, Reed had the following relevant exchange with the State:

Q: Are you saying you would never, ever allow yourself to be alone with one of [your grandchildren]? Is that what you're saying?

A: Right.

Q: Okay. And was that [a] rule because you have an attraction to young children?

A: No.

Q: So is it your testimony here today that you have absolutely no attraction to young men?

A: No.

Q: And you would never view young men in a state of nudity?

A: What's that?

Q: Are you saying you would never view young men in a state of nudity?

A: Yes, I have.

Q: Yes, you have.

A: On the internet.

Q: On the internet. Okay. And what young -- when did this occur?

A: Late 2006, 2007.

Q: So you're testifying here today that you have, and you do have an attraction for young men then, if you're watching young men in the state of nudity on the internet?

A: I don't have an attraction for them.

*Id*. at p. 182-83. Reed denied watching child pornography and insisted that it was adult pornography and it was always "teenagers, or eighteen and older." *Id*. at p. 184.

{¶25} Reed stated that he was always by himself when he was watching pornography and that he only watched the pornography for six or seven weeks in late 2006, early 2007. Reed also stated that he was always clothed when watching pornography.

{¶26} The State then called Tina Reed as a rebuttal witness. Tina testified that Reed is her father-in-law and that she lived with Reed from 2009-2011. Tina stated that Reed would sometimes watch M.R. and his younger brother when their father brought them over to visit. Tina also stated that she observed Reed watching child pornography on her computer.[1] Tina testified:

Q: Okay. And what, if anything, disturbing did you see?

---

[1] Reed's trial counsel objected to Tina's testimony regarding the pornography as irrelevant. However, the trial court overruled Reed's objection and ruled that the proposed testimony would be relevant to his credibility.

A:    [Reed] sitting at the computer chair naked watching porn, child porn.

Q:    Why do you say it was child porn?

A:    Because I could see it.

Q:    Okay.

A:    It was little boys.

Q:    Okay.  And when you say "little boys," can you tell me how old they were?

A:    They couldn't have been older than fifteen.

Q:    Okay.

A:    They were young.

*Id*. at p. 201.

**{¶27}** Tina also stated she would see Reed looking at this type of pornography almost every day.  Tina stated that she, personally, never confronted Reed about the pornography but there was a "family meeting" where her family asked Reed about the pornography.  *Id*. at p. 202.  Reed stated that he was watching it to see the different penis sizes.  *Id*.  Tina stated that she left her child alone with Reed.

**{¶28}** On cross-examination, Tina explained that she and her husband got Reed a computer from Rent-A-Center to use.  She stated that she gave the computer to Detective Wiseley after M.R. made allegations against Reed.  Tina

then explained where she would be, in relation to Reed, when he was looking at child pornography.

> A:   To come up the stairs -- we live downstairs in the basement. You have to come up the stairs, in the door, into a living room. Go through the kitchen, which connects to the living room, to another living room. In that other living room, there is a computer desk in this corner, and the bathroom is over here in the hallway.
>
> Q:   So you're on the opposite side of the room, correct?
>
> A:   Yes.
>
> Q:   How far away would you say you were?
>
> A:   It's not that far. I don't know. Probably five feet, maybe.
>
> Q:   You're five feet away from a naked guy looking at child porn --
>
> A:   Yes.
>
> Q:   -- on a regular basis?
>
> A:   Yes.
>
> Q:   That's your testimony, that on a regular basis --
>
> A:   Yes.
>
> Q:   -- he would be naked, looking at child porn five feet away from you?
>
> A:   Yes.
>
> Q:   And you lived there for how long?
>
> A:   Two years. About two years.

*Id*. at p. 205.

{¶29} The State also called Detective Wiseley again as a rebuttal witness. Detective Wiseley stated that when he learned that Reed might be viewing child pornography, he took the computer into the custody of the Wyandot County Sheriff's Office. He stated that Tina, as the owner of the computer, gave him permission to take the computer. Detective Wiseley stated that the computer was sent to Ohio Bureau of Criminal Investigation ("BCI") for analysis but has not received the results yet.

{¶30} On cross-examination, Detective Wiseley testified that he took possession of the computer a year ago, in September of 2012. He also stated that he sent the computer to BCI six weeks ago. Detective Wiseley then had the following relevant exchange:

> Q: So you guys didn't send it in -- your department didn't send it in to BCI for analysis until six weeks prior to trial, correct?
>
> A: That's correct.
>
> Q: You've had it in your possession for ten and a half months?
>
> A: I already answered that. Yes, sir.

*Id*. at p. 209.

{¶31} Both the State and Reed offered their closing statements and the trial court charged the jury before deliberations.

{¶32} That same day, the jury returned guilty verdicts on all counts. The trial court ordered a presentence investigation report ("PSI") and this matter

proceeded to sentencing on September 20, 2013. After hearing evidence and argument related to punishment, the trial court imposed the sentence as follows: (1) 10 years to life in prison for the first rape count; (2) 10 years to life for the second rape count; and (3) five years in prison for the gross sexual imposition count, all to be run consecutively. As such, the trial court imposed a total prison term of 25 years to life.

{¶33} Reed filed this timely appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING APPELLANT'S MOTIONS [SIC] FOR ACQUITTAL AT THE END OF THE STATE'S EVIDENCE, AS THE EVIDENCE PRESENTED WAS INSUFFICIENT FOR A CONVICTION**

### Assignment of Error No. II

**THE JURY VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### Assignment of Error No. III

**APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE INEFFECTIVE ASSISTANCE OF COUNSEL.**

### Assignment of Error No. I

{¶34} In his first assignment of error, Reed argues that the trial court erred by denying his motion for acquittal because the State presented insufficient

evidence for a conviction. Specifically, Reed argues that because J.P. failed to make an in-court identification of Reed, the trial court should have granted his motion for acquittal on counts two and three. We disagree.

*Standard of Review*

**{¶35}** Under Crim.R. 29(A), "a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), syllabus. Consequently, a motion for acquittal tests the sufficiency of the evidence. *State v. Miley*, 114 Ohio App.3d 738, 742 (4th Dist.1996).

**{¶36}** When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

*R.C. 2907.02(A)(1)(b)*

**{¶37}** Reed was charged with two counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

Further, "sexual conduct" is defined as:

> [V]aginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

**{¶38}** On appeal, Reed argues that M.R.'s and J.P.'s testimony was incredible, and thus the trial court erred in denying his motion for acquittal. However, credibility issues pertain to the weight of the evidence, not sufficiency of the evidence. *See Thompkins*, 78 Ohio St.3d at 388-90. Thus, we will not address this issue until we discuss Reed's second assignment of error regarding manifest weight.

-20-

{¶39} Reed also asserts that J.P. never made an in-court identification of Reed, and thus he should have been acquitted on counts two and three. Generally, there is no requirement that in criminal cases a defendant must be identified in court by a witness. *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19; *In re W.S.*, 11th Dist. Geauga No. 2009-G-2878, 2009-Ohio-5427, ¶ 41; *State v. Irby*, 7th Dist. Mahoning No. 03 MA 54, 2004-Ohio-5929, ¶ 14. " 'Identity may be established by direct evidence, but direct evidence of identification is not required; circumstantial evidence may be sufficient to establish the identity of [the] accused as the person who committed the crime * * *.' " *State v. Scott*, 3 Ohio App.2d 239, 244-45 (7th Dist.1965), quoting 23 C.J.S. Criminal Law § 920, p. 645; *see also State v. Brown*, 10th Dist. Franklin No. 07AP-244, 2007-Ohio-6542, ¶ 19.

{¶40} M.R. was the first witness to testify for the State and he made a positive in court identification of Reed and also mentioned him by name. J.P. subsequently took the stand and identified Reed by name. Both M.R. and J.P. testified that Reed lived in Sycamore, Ohio. Viewing the evidence in the light most favorable to the State, we find that there was enough circumstantial evidence presented to prove Reed's identity.

{¶41} Further, both M.R. and J.P. testified that Reed inserted an instrument into their anal openings. M.R. and J.P. both testified that they were under the age

of 13 when this sexual conduct occurred. Therefore, we find that at the conclusion of the State's evidence, a rational trier of fact could have found that the State proved the essential elements of rape beyond a reasonable doubt.

*R.C. 2907.05(A)(4)*

{¶42} Reed was also charged with one count of gross sexual imposition in violation of R.C. 2907.05(A)(4) which states:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more persons to have sexual contact when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

Further, "sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or if the person is female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶43} As mentioned above, at the close of the State's evidence, J.P. had testified that he was under the age of 13 when Reed touched his genitals while they were at Scout Village. J.P. testified that Reed only checked for leeches around his genitals and nowhere else on his body. Further, J.P. stated that Reed stopped abruptly once other campers arrived at Scout Village. Therefore, the State

provided sufficient evidence that Reed had sexual contact with J.P., a minor under the age of 13, with the purpose to sexually gratify himself.

**{¶44}** Accordingly, we overrule Reed's first assignment of error.

### *Assignment of Error No. II*

**{¶45}** In his second assignment of error, Reed argues that his convictions were against the manifest weight of the evidence.  We disagree.

### *Standard of Review*

**{¶46}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction."  *Id*. at paragraph three of the syllabus.

*Evidence at Trial*

**{¶47}** In addition to the State's case-in-chief, Reed took the stand to testify in his defense. On direct examination, Reed stated that he was never alone with M.R. and never touched him inappropriately. Further, Reed admitted to being alone with J.P. at Scout Village the day the alleged sexual contact took place, but adamantly denied ever seeing J.P. naked, or touching him in an inappropriate manner. Reed also admitted that J.P. came over to his house the day after he and J.P. went to Scout Village, but stated that J.P. watched a movie the entire time. Again, Reed denied touching J.P. or inserting anything into J.P.'s anus.

**{¶48}** On cross-examination, Reed admitted to watching pornography of young men, but insisted that it was "eighteen years or older." Trial Tr., p. 189. Reed also stated that it was only for six or seven weeks and that he was always fully clothed and by himself when watching the pornography.

**{¶49}** The State called Tina Reed as a rebuttal witness, who testified that she saw Reed watch child pornography on her computer while she was living with Reed from 2009-2011. She further testified that Reed would watch this child pornography naked. The State also recalled Detective Wiseley to the stand, who confirmed that he confiscated the computer on which Reed was allegedly watching child pornography. Although the computer had been in the possession

of the Wyandot County Sheriff's Office for almost a year, the computer was sent to BCI only six weeks before the trial for analysis.

**{¶50}** On appeal, Reed's only argument that the jury's verdict was against the manifest weight of the evidence is that M.R.'s and J.P.'s testimony was incredible. Thus, the jury should have believed Reed's version of events and found him not guilty.

**{¶51}** "It is well-established that '[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.' " *State v. Bates*, 12th Dist. Butler No. CA2009-06-174, 2010-Ohio-1723, ¶ 11, quoting *State v. Bromagen*, 12th Dist. Clermont No. CA2005-09-087, 2006-Ohio-4429, ¶ 38. Further, the credibility of witnesses is primarily an issue for the trier of fact. *State v. Payne*, 3d Dist. Hancock No. 5-04-21, 2004-Ohio-6487, ¶ 15. Accordingly, this court must afford the decision of the trier of fact the appropriate deference when considering such credibility issues. We will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently clear that the fact finder lost its way. *Payne* at ¶ 15; *see also State v. Parks*, 3d Dist. Van Wert No. 15-03-16, 2004-Ohio-4023, ¶ 13.

**{¶52}** Reed's credibility was attacked when Tina's testimony conflicted with Reed's. While Reed stated he watched male pornography of young men who

were over the age of 18, Tina stated that she saw Reed watch pornography of boys who were under the age of 15. Reed also stated that he was never naked when he viewed the pornography, but Tina testified that he would sit in a chair, naked, when he watched pornography. Lastly, Reed testified that he only watched pornography for six or seven weeks, whereas Tina testified that he watched the pornography for over a year and a half.

{¶53} Looking at all the evidence before us, we cannot say the trier of fact lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The trier of fact was in the best position to hear all of the witnesses' testimony, observe the witnesses, and determine their reliability. Further, there is limited evidence in the record before us indicating that Reed's version of events was entirely credible. Reed was contradicted when the State presented its rebuttal witnesses. Further the two victims' testimony was corroborated by the State's other witnesses, and also by Reed himself.

{¶54} Accordingly, we overrule Reed's second assignment of error.

### Assignment of Error No. III

{¶55} In his third assignment of error, Reed argues that he was denied effective assistance of counsel. Specifically, Reed argues that his trial counsel was ineffective because he did not make objections to improper questioning throughout the trial. We disagree.

{¶56} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Id.* at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), *superseded by constitutional amendment on other grounds as recognized by State v. Smith*, 80 Ohio St.3d 89, 103, 1997-Ohio-355.

{¶57} Further, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Barnett*, 3d Dist. Logan No. 8-12-09, 2013-Ohio-2496, ¶ 45. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.' " *Id.*, quoting *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661 (1986).

{¶58} Generally, trial tactics, even questionable ones, do not constitute a deprivation of effective counsel. *State v. Ray*, 3d Dist. Union No. 14-05-39, 2006-Ohio-5640, ¶ 63. Further, "trial counsel's failure to make objections is within the

realm of trial tactics and does not establish ineffective assistance of counsel." *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 31; *Ray*, 2006-Ohio-5640, ¶ 63.

{¶59} On appeal, Reed argues that his trial counsel failed to object to prejudicial and improper comments the prosecutor made during voir dire, opening statements, cross-examination, and in closing statements. Upon our review of the record, the actions of Reed's trial counsel appear to have been tactical or strategic trial decisions. As such, the actions or inactions of Reed's trial counsel do not fall below an objective standard of reasonable representation. Further, the inactions of Reed's trial counsel did not create any reasonable probability of a different outcome.

{¶60} Reed also argues that the prosecutor made an improper statement in his closing argument when he stated that "[k]ids just don't make that sort of stuff up * * * it had a ring of truth to it[]" and that his trial counsel was ineffective for failing to object to the alleged misconduct. Trial Tr., p. 222. Generally, the State is granted "wide latitude" in its closing statements. *State v. Lott*, 51 Ohio St.3d 160, 165 (1990). However, a prosecutor may not vouch for the truthfulness of a witness. *State v. Masing*, 6th Dist. Ottawa No. OT-01-022, * 3, 2002-Ohio-1873. This is because "expressions of personal opinion by the prosecutor are 'a form of unsworn, unchecked testimony and tend to exploit the influence of the

prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued.' " *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 21, quoting *State v. Rahman*, 23 Ohio St.3d 146, fn 8 (1986). However, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**{¶61}** Reed does not raise in a separate assignment of error that the State engaged in prosecutorial misconduct,[2] only that his trial counsel was ineffective for failing to object to this one incident of alleged misconduct. When a trial counsel fails to object to a prosecutor's repeated "pejorative ranting at his client's expense" courts have found that his performance fell below an objective standard of reasonable representation. *State v. Carpenter*, 116 Ohio App.3d 615, 626, (2d Dist.1996). In *Carpenter* the prosecutor "went beyond merely arguing reasonable inferences from the facts, and asserted as fact that the defendant was a liar and that the state's witnesses were honest." *Id*. at 624. The prosecutor made repeated improper comments throughout the trial, without a single objection from the defense counsel. *Id*. We find the present matter distinguishable, as the prosecutor's comment was an isolated incident and had almost no effect on the fairness of Reed's trial. Therefore, the decision of Reed's trial counsel not to

---

[2] Although it appears that the State's statement during its closing argument came close to witness vouching, whether the State engaged in prosecutorial misconduct was not raised by Reed and we decline to address the issue.

object during the State's closing statement was a tactical decision and was reasonable under *Strickland* standards.

**{¶62}** Accordingly, we overrule Reed's third assignment of error.

**{¶63}** Having found no error prejudicial to Reed in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**