[Cite as *State v. Taylor*, 2014-Ohio-1793.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,            CASE NO.  1-13-46

    v.

MAURICE T. TAYLOR,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2013 0129

**Judgment Affirmed**

**Date of Decision:  April 28, 2014**

APPEARANCES:

    *Michael J. Short*  for Appellant

    *Jana E. Emerick*  for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Maurice Taylor, appeals the judgment of the Court of Common Pleas of Allen County convicting him of domestic violence and sentencing him to 18 months in prison. On appeal, Taylor argues that the trial court erred by scheduling his trial outside of the statutorily required speedy trial date and by entering a guilty verdict that was against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On April 21, 2013, Taylor was arrested and then indicted by the Allen County Grand Jury for domestic violence, a felony of the fourth degree, in violation of R.C. 2919.25(A) and (D)(3). Taylor made a request for discovery on May 22, 2013, and the State responded to the request on May 24, 2013. On June 24, 2013, Taylor moved for a competency evaluation, which the trial court granted. Taylor filed a waiver of the right to a speedy trial with the court on June 26, 2013. The waiver was signed by his counsel.

{¶3} At a hearing held on July 24, 2013, both Taylor and the State stipulated to the competency evaluation report and the court found Taylor competent to stand trial. Taylor's counsel indicated that he would sign a speedy trial waiver, but when asked, Taylor refused. Further, Taylor requested new counsel, as he had not been informed of the filing of a waiver of his right to a speedy trial or the motion for a competency hearing. He further accused his

counsel of telling lies and stated that she accused him of being guilty. As a result, defense counsel moved to withdraw, which the court granted. New counsel was appointed for Taylor that same day.

{¶4} A pre-trial hearing was held on August 5, 2013, to "talk about getting [the case] back on the trial docket as we indicated on July twenty-fourth * * *." Aug. 5, 2013 Hearing Tr., p. 2. At the start of the proceedings, Taylor moved the court to dismiss the case for violating his right to a speedy trial under the Constitutions of both the United States and Ohio and under Ohio statute. He argued that his waiver was invalid and that, as a result, it was already past the point where the trial should have commenced under the law.

{¶5} In response, the court stated that it agreed with Taylor that the waiver was invalid, as Taylor had not signed it on the record in open court. However, the trial court found that Taylor's June 24, 2013 motion for a competency evaluation tolled the time for a speedy trial until the court ruled on the motion on July 25, 2013. Taylor disagreed. In response, the court ruled:

> that the motion for an evaluation of competency that was filed on June twenty-fourth, tolled the speed [sic] trial statute. The decision on competency was made on July twenty-fourth and that's when the uh, speedy trial clock started uh, going again, except for the fact that as you were advised, when you requested [your counsel] to go off the case and get new court appoint [sic] counsel, that tolled it, but that was only - - that was the same day, so there's no tolling there.
> So the Court's calculation, you were arrested on April twenty-first, 2013, and so you had up until June twenty-fourth when the

motion for competency was filed, that tolls it. At that point you had sixty-four days. That left twenty-six days left after that.

When I decided your competency on July twenty-fourth, that's when that twenty-six days started to tick again. So, there was seven more in July, that left nineteen. So you're [sic] trial will be scheduled uh, for August twentieth.

Now, that's one day more than your speedy trial. And the reason the Court is doing that is because on checking my calendar, the Court has several, I think three or four sentencings set on the nineteenth, plus about a half dozen criminal pre-trials in cases that were previously set.

*Id.* at p. 11. The court then overruled the motion to dismiss "based upon the findings that I already made in terms of the speedy trial provisions that did not expire." *Id.* at p. 13. The court reiterated that the written waiver of a right to a speedy trial signed by Taylor's counsel was invalid, stating "it wouldn't be valid even if it was your signature because it wasn't in open court. So the written waiver of speedy trial has no legal significance in this case whatsoever." *Id.*

{¶6} A final pre-trial hearing occurred on August 15, 2013. While not specifically making a motion to dismiss, Taylor again raised the issue of his right to a speedy trial, arguing that the time ended on August 17, not August 19. While not agreeing with Taylor's calculation, the trial court stated that August 17 was a Saturday, which would still make August 19 the final day of the 90-day statutory limit. The trial court went on to state that it had "already put on the record that uh, the nineteenth, because of the Court's crowded docket, I'm moving it to the twentieth. So that's a matter of record." Aug. 15, 2013 Hearing Tr., p. 5.

{¶7} Taylor repeated that the judge was violating his right to a speedy trial and requested that he be allowed to represent himself in his case. In response, the trial court informed Taylor of his right to an attorney and explained in detail the rights he would be waiving if he chose to represent himself. After this extensive dialogue with Taylor, Taylor signed a waiver of his right to counsel, which the trial court accepted. (Docket No. 56, p. 1). After signing the waiver, Taylor again expressed that he believed his right to a speedy trial had been violated. In response, the trial court again stated that it had made its decision to begin the trial on August 20, 2013, one day beyond the ninety days required by statute, as a result of a crowded docket.

{¶8} The trial commenced on August 20, 2013. The following relevant evidence was adduced.

{¶9} As its first witness, the State called Heather Snodgrass to testify. Snodgrass testified that on the day of the alleged altercation, April 21, 2012, she was living at 1218 Hughes Avenue. August 20, 2013 Trial Tr., p. 41. She further stated that she lived there with Taylor and identified him. During her testimony, the State played her 911 call for the jury. On the call, she stated that her boyfriend had beaten her, and that he was currently at his house on 1218 Hughes Avenue. She also stated on the call that everything she owned was in that house, and that she was staying there.

{¶10} When asked about the events of that day, Snodgrass testified that Taylor had been out at a party the night before to get drunk. She had stayed at 1033 Hughes Avenue the night before, and Taylor came to get her that morning. When she returned home to 1218 Hughes Avenue, Taylor grabbed her by the throat and choked her, telling her she was going to die. When asked whether Taylor said anything as he was choking her, Snodgrass testified:

> A: Yea. "Bitch, you're going to die." He kept telling me to tell Haley Renee Dukes bye, my child that he don't even know.
>
> Q: Okay. Who's Haley Renee?
>
> A: My daughter.
>
> * * *
>
> Q: Okay. All right. He tells you that you're going to die. What does he say about your daughter?
>
> A: He just keeps telling me, "Look at me in my eyes, bitch, and tell Haley Renee Dukes bye," as he's choking me.
>
> Q: Okay. What happens next?
>
> A: Everything - - my body just went limp and everything went white.

*Id.* at p. 44.

{¶11} Snodgrass testified that when she was choked and passed out in the living room, she defecated. She awoke in the shower, naked. She had been wearing clothes when she lost consciousness and did not know how she had gotten

to the bathroom or how her clothes were removed. When she regained consciousness Taylor was slapping her on both sides of her face while her clothes were on the floor, covered in her feces. She stated that Taylor kept "yelling at me to wash myself, I'm nasty looking, and I'm this and that." *Id.* at p. 45. He continued to hit her on her face, and then "uppercut [her] on [her] throat" which caused her to bleed and have trouble breathing. *Id.* at p. 46. When asked where the blood was coming from, she stated "[f]rom my mouth. I don't know if it was from my tongue or my throat." *Id.*

{¶12} Snodgrass testified that after she got out of the shower, Taylor forced her to drip dry without a towel and then whipped her with an extension cord. When asked exactly how it happened, she stated:

A: He just made me get out [of the shower] and bend over the toilet and then hit me with the extension cord across my back.

Q: Okay. And how many times did he do that?

A: Well, he hit me once the first time, and then when he made me get out of the shower he hit me again. So, twice altogether.

Q: All right. Did he say anything while he was doing that?

A: No, I don't even remember what he was saying. He kept saying all kinds of stuff. I'm nasty. I'm so skinny. I look like I'm aids [sic] infested, and all kinds of stuff.

Q: Okay. All right. After that what happens next?

A: Then he laid me on the bed and I'm thinking I'm about to die on my grandma's frickin' [sic] stuff.

*Id.* at p. 47. Snodgrass testified that, at some point, she asked Taylor for a drink of water, and when he left the bedroom to go to the kitchen she left the home and ran. She was unable to get inside the first house that she tried to enter, prompting her to run back to 1033 Hughes Avenue, where she called police. When they arrived, she told them what had happened and they took pictures of her injuries. After the police finished taking pictures of her injuries, they went to 1218 Hughes Avenue to place Taylor under arrest and help her remove her belongings from the home.

{¶13} When asked what kinds of things she removed from the home, the following exchange took place:

> A: Pots and pans, all my clothes, my bathroom stuff, a bed frame, a new dresser, and pictures.
>
> Q: So, were there any possessions of yours that, or, things that you owned that weren't at this house?
>
> A: Everything was there.
>
> Q: Okay. And how long had you lived there?
>
> A: Probably six months.
>
> Q: Did you share a bedroom?
>
> A: Uh-huh. We slept in the same bed.
>
> Q: Okay. Did you have sex with the defendant?
>
> A: Uh-huh.
>
> Q: Okay. How about bills? Who paid the bills?

A:    Both of us.

Q:    Okay.  What kind of bills did you pay.

A:    Gas, water, and electric.

* * *

Q:    Did you cook meals there?

A:    Every day.

Q:    And did you cook for the defendant?

A:    Yes I did.

* * *

Q:    Did you live as a couple there?

A:    Yes we did.

*Id.* at p. 53-54.

{¶14} Snodgrass then stated that she was currently on probation.  When asked what address she had given her probation officer, she responded 1033 Hughes Avenue.  She explained that she had been living at 1033 Hughes Avenue before she moved in with Taylor and that her probation officer believed that Taylor was trouble and would not have allowed her to live with him.  As a result, she moved in with Taylor without telling her probation officer.  She stated that, at the time of the altercation, she had been living with Taylor for six months and no longer had any personal items at 1033 Hughes Avenue.

{¶15} The State then asked how Snodgrass removed her items from 1218 Hughes Avenue. She testified that she removed all of her personal belongings with the help of the police. She removed everything she owned from the house and left it outside until she could get help moving it. When she was finished, she gave Taylor "the key when the police was standing there and I left and I never went near that house again." *Id.* at p. 58.

{¶16} On cross-examination, Taylor asked whether they had lived together for two months, as she had stated at a preliminary hearing, or whether they had lived together for six as she had testified on direct examination. She replied "[i]t was six months. You know when I started staying at your house. Just like the water company. All them people know when Heather Snodgrass started living there because I took care of all the bills." *Id.* at p. 59. When asking about inconsistencies in her written statement, specifically that she lived at 1033 Hughes Avenue and the length of their relationship, she replied "when a person just almost got their life taken from them and everything was fucked up, I had a lot of things going through my head and so I could have wrote a few different things five different times on the same piece of paper. A person's mind is fucked up when they just got their ass beat." *Id.* at p. 63. Snodgrass also stated that she did not go to the hospital because the police had taken pictures of the injuries and she did not want to incur the medical bills.

{¶17} Taylor went on to ask about the 911 call, and the following exchange took place:

> Q:   Then you further state, ma'am, when asked, they say, "Okay, do you both live there [at 1218 Hughes Avenue]?" "Well, he does. I basically - - I'm staying there, yea."
>
> A:   Yea. You know why I said that? Because I'm scared they're putting you in jail and my P.O.'s going to put me in jail for living at your house because he didn't like you. He said you was trouble when I mentioned you before I moved in there. So, you're right – I didn't tell my P.O. I was scared because I didn't want them to get back to my P.O. and him lock me up for six months.
>
> Q:   So, you misled the truth with the Courts in order for them not to - - for you not to go to jail, is what you're saying.
>
> A:   Well, honey, all the truth's been out. So, ain't [sic] nobody lying.
>
> Q:   So, what address does your P.O. have you for? What address does your P.O. have you staying for?
>
> A:   He has 1033. Honey, --
>
> Q:   He never known 1218 Hughes?
>
> A:   No, and I'm not going to tell him about you because I would have went to jail. I'm not that stupid. That's why I lied every time I went to see my P.O.
>
> Q:   You lied?
>
> A:   I lied to my probation officer about where I lived, honey. That's why he wrote a statement saying 1033 because my P.O. ain't [sic] never going to hear it out of my mouth. I'm not going to tell on myself and go to jail.

*Id.* at p. 65-66. Snodgrass also admitted to having a theft conviction from 2007.

{¶18} Officer Patricia Wogerman of the Lima Police Department was the next witness to testify. She stated that on April 21, 2013, she responded to a 911 call from Snodgrass at 1033 Hughes Avenue. After taking her complaint, Officer Wogerman accompanied Snodgrass to 1218 Hughes Avenue. Taylor allowed them into the residence, and "agreed that there was an altercation there in the morning between him and Miss Snodgrass." *Id.* at p. 72. Officer Wogerman testified that Taylor acknowledged that he caused the injuries to Snodgrass. When asked to describe the injuries she herself witnessed, she testified that Snodgrass had marks on her neck and in her mouth, as well as welts on her back. The injuries on her face were consistent with "[b]eing struck in the face. The injuries on her neck were marks, like fingerprints. Across her back were welts consistent with what she had told us that he struck her with an extension cord." *Id.* at p. 73. Officer Wogerman was able to identify Taylor in open court.

{¶19} Officer Wogerman then testified that Taylor was taken into custody as the primary aggressor for domestic violence. After Taylor was taken into custody, Snodgrass removed all of her personal belongings from the home. Officer Wogerman described the types of belongings Snodgrass removed:

> A: Clothes and toiletries. She took apart a bed frame and put that out onto the porch area. There were lamps, end tables, boxes from the kitchen. She was collecting things – pots and pans, dishes, and things like that.

Q:    Did she have any personal items, such as toiletries, or food, or anything like that?

A:    Yes, she did.  She gathered those as well.

Q:    Okay.  So, it sounds like she had quite a bit of stuff in there.  Is that fair to say?

A:    Yes.

*Id.* at p. 74.  Officer Wogerman testified that the items Snodgrass removed from the home filled the entire enclosed porch and some of the area outside.

{¶20} On cross-examination, Taylor asked why there were no photos of the injuries Snodgrass sustained on her neck.  Officer Wogerman replied that she did not know.  He also referred to marijuana allegedly found in the residence, and asked:

Q:    Was it because of sympathy for the victim that the marijuana was not reported?  That's what I'm asking you.

A:    No.

Q:    So why wasn't the marijuana reported?

A:    We couldn't prove whose it was, and so it wouldn't really - - there wasn't a significant amount there.

Q:    A quarter ounce isn't a significant amount to you?

A:    A quarter ounce?

Q:    Well, like you said, they all threw it away and so we'll never know.

*Id.* at p. 79. Taylor went on to ask whether the porch was already full with chairs and a table when they began helping Snodgrass remove her personal belongings. In response, Officer Wogerman stated:

> A: Yes, there were some things.
>
> Q: So, you would agree that the porch was majority already full?
>
> A: I wouldn't say the majority. There were some things on the porch; yes.
>
> Q: And you said that she took lamps and things of that nature, too?
>
> A: Yes. She said they were hers and she took them and set them outside. She said everything she owned was there and she was trying to take it all.

*Id.*

{¶21} The State called Detective Sean Neidemire with the Lima Police Department to testify. He stated that he investigated whether Taylor had a prior domestic violence conviction. Detective Neidemire identified a certified copy of a journal entry, finding Taylor guilty of the crime of domestic violence on June 29, 2006. Detective Neidemire testified that Taylor was the defendant in the prior case, and identified him for the court. He also testified that he was present at Taylor's preliminary hearing. Detective Neidemire identified a transcript of the

proceeding and was asked to read a portion to the jury,[1] resulting in the following exchange:

> Q: Okay. Drawing your attention to where it says, "Mr. Taylor," and he says, "Can I say something to you Mr. Judge?"
>
> A: Yes.
>
> Q: Okay. What does it say?
>
> A: It says, or, Mr. Taylor says "Can I say something to you, Mr. Judge? Please. I did this. I'm sorry for what I did. I'm guilty to this."
>
> Q: Okay. Do you remember him saying that in Court?
>
> A: Yes, sir, I do.

*Id.* at p. 85.

{¶22} On cross-examination, Detective Neidemire testified that he conducted a criminal background check on Snodgrass. He testified that the background check for Snodgrass stated that she should be approached with caution, but that he did not know why that warning was a part of the report.

{¶23} After Detective Neidemire's testimony, the State rested. Taylor did not present any witnesses or exhibits at trial.

---

[1] We note that Taylor objected to this testimony, claiming that his comments at the preliminary hearing had been stricken from the record. However, our review of the record indicates that while Taylor's counsel did request that Taylor's comments be stricken from the record, that motion was not granted, with the court instead stating "he made a statement but it was not under oath," with the state responding that they would "take it for it's [sic] value your honor." Apr. 26, 2013 Preliminary Hearing Tr., p. 13.

{¶24} The jury found Taylor guilty of domestic violence. Taylor did not wish to have a pre-sentence investigation conducted, and as a result, the trial court proceeded immediately to sentencing. The court then sentenced Taylor to 18 months in prison with three years of post-release control.

{¶25} Taylor filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN NOT DISMISSING THE CHARGES AGAINST THE DEFENDANT FOR A VIOLATION OF HIS RIGHT TO A SPEEDY TRIAL.**

*Assignment of Error No. II*

**THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. I*

{¶26} In his first assignment of error, Taylor argues that the trial court violated his right to a speedy trial. Specifically, Taylor argues that the court, after calculating when he must be brought to trial under Ohio statute, set his trial one day beyond the time limit without stating the reason why in a judgment entry. We disagree.

{¶27} Our standard of review upon an appeal raising a speedy trial issue is to count the expired days as directed by R.C. 2945.71, et seq. *State v. DePue*, 96 Ohio App.3d 513, 516 (4th Dist.1994); *see also State v. King,* 3d Dist. Marion No.

9-06-18, 2007-Ohio-335, ¶ 30; *State v. West*, 3d Dist. Auglaize No. 2-06-04, 2006-Ohio-5834, ¶ 24.  If any ambiguity exists, we construe the record in favor of the accused. *See State v. Singer*, 50 Ohio St.2d 103, 109 (1977); *State v. Mays*, 108 Ohio App.3d 598, 609 (8th Dist.1996).  The computation of time for criminal statutes is governed by Crim.R. 45, which provides:

> In computing any period of time prescribed * * * by any applicable statute, the date of the act or event from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included * * *.

The date of the arrest is not included for the purpose of calculating time under the statutes for a speedy trial.  *State v. Huston*, 3d Dist. Wyandot Nos. 16-05-23, 16-05-24, 2006-Ohio-6857, ¶ 7.

{¶28} The applicable statutory speedy trial provision, R.C. 2945.71(C)(2), provides that a person charged with a felony shall be brought to trial within 270 days after the person's arrest.  R.C. 2945.71(E) counts each day a defendant is held in jail in lieu of bail as three.  R.C. 2945.73(B) provides:

> Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code.

"The prosecution and the trial courts have a mandatory duty to try an accused within the time frame provided by the statute." *State v. Ramey*, 132 Ohio St.3d

309, 2012-Ohio-2904, ¶ 14. Further, the State must strictly comply with the statute. *Id.*; *State v. Pudlock*, 44 Ohio St.2d 104, 105 (1975).

**{¶29}** However, R.C. 2945.72 allows for an extension of the time that the accused must be brought to trial under certain circumstances. This includes any period where the competence of the accused is being determined. R.C. 2945.72(B). Also excluded from the speedy trial calculation is "[a]ny period of delay necessitated by reason of a * * * motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E). This includes motions by the defendant for discovery. *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, ¶ 23, 26. For the statutory time period to be tolled, the State must respond to the motion in a reasonable amount of time. *See State v. Johnson*, 3d Dist. Marion No. 9-10-47, 2011-Ohio-994, ¶ 24 (finding 8 day response time to request for discovery reasonable and tolled statute); *State v. Risner*, 3d Dist. Seneca No. 13-03-40, 2004-Ohio-186, ¶ 18 (finding 16 day response time to request for discovery reasonable and tolled statute).

**{¶30}** In the case sub judice, it is undisputed that Taylor remained in jail in lieu of bond from the time that he was arrested until the time of his trial. As a result, the State was required to bring Taylor to trial within 90 days of his arrest under statute. Two tolling events occurred between Taylor's time of arrest and the

time of his trial; specifically, a motion requesting discovery on May 22, 2013, and a motion for a competency evaluation on June 24, 2013.[2]

**{¶31}** Taylor was arrested on April 21, 2013. Thirty one days elapsed between the time of Taylor's arrest and his May 22, 2013 motion for discovery. The state responded to this motion on May 24, 2013. We find that this was a reasonable amount of time to respond to the motion, and thus the statutory speedy trial time limit was tolled during this time period. An additional 31 days elapsed between the state's response and June 24, 2013, when Taylor moved for a competency evaluation. This again tolled the statutory speedy trial time limits until the July 24, 2013 hearing where the court found Taylor competent to stand trial. Another 27 days elapsed until Taylor was brought to trial on August 20, 2013. Adding all of this time together, Taylor was brought to trial 89 days following his arrest, which is within the 90-day time limit required by statute.

**{¶32}** Accordingly, we overrule Taylor's first assignment of error.

*Assignment of Error No. II*

**{¶33}** In his second assignment of error, Taylor argues that his conviction was against the manifest weight of the evidence. We disagree.

---

[2] We note that there may have been other tolling events that occurred between Taylor's arrest and the time of his trial. However, as these two events bring Taylor's trial date within the time prescribed by law, we choose not to address any other possible tolling event.

*Standard of Review*

**{¶34}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

*Elements of R.C. 2919.25(A)*

**{¶35}** The offense of domestic violence occurs when a person "knowingly cause[s] or attempt[s] to cause physical harm to a family or household member." R.C. 2919.25(A). A "family or household member" includes someone who (1) is residing or has resided with the offender, and (2) is "living as a spouse." R.C. 2919.25(F)(1)(a)(i); *State v. Eberly*, 3d Dist. Wyandot No. 16-04-03, 2004-Ohio-

3026, ¶ 20. The statute defines a person living as a spouse as a person "who is otherwise cohabitating with the offender * * *." R.C. 2919.25(F)(2).

**{¶36}** While no definition exists in statute, the Ohio Supreme Court has found that cohabitation consists of two essential elements: "(1) sharing of familial or financial responsibilities and (2) consortium." *State v. Williams*, 79 Ohio St.3d 459, 465 (1997). A factor test is employed to determine whether these two elements are met:

> Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.

*Id*.; *see also Eberly* at ¶ 21. A violation of the statute is a felony of the fourth degree where "the offender previously has pleaded guilty to or been convicted of domestic violence * * *." R.C. 2919.25(D)(3).

*Evidence at Trial*

**{¶37}** Here, Taylor does not dispute that he caused harm to Snodgrass, and ample evidence exists on the record to support that conclusion. Nor does Taylor dispute that he had a prior conviction for domestic violence. Instead, Taylor argues that Snodgrass did not reside with him and was not a "family or household member" under R.C. 2919.25(A). In essence, Taylor argues that the jury lost its

way when it believed the testimony of Snodgrass that she lived with him at the time of the offense.

**{¶38}** A verdict is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony. *State v. Reed*, 3d Dist. Wyandot No. 16-13-11, 2014-Ohio-644, ¶ 51. Witness credibility is primarily an issue for the trier of fact and we will not substitute our judgment unless it is patently clear that the fact finder lost its way. *Id.*; *State v. Payne*, 3d Dist. Hancock No. 5–04–21, 2004–Ohio–6487, ¶ 15; *see also State v. Parks*, 3d Dist. Van Wert No. 15–03–16, 2004–Ohio–4023, ¶ 13. "Accordingly, this court must afford the decision of the trier of fact the appropriate deference when considering such credibility issues." *Reed* at ¶ 51.

**{¶39}** At trial, evidence was presented that Snodgrass lived with Taylor for approximately six months, sharing expenses and sleeping in the same bed at the time of the altercation. Snodgrass testified that all of her personal belongings were in the house and that she helped pay the bills, cook meals, and that she and Taylor had a sexual relationship. Officer Wogerman testified that Snodgrass removed numerous personal items from the home, including pots and pans, part of a bed and other personal items, filling up the back porch and spilling into the surrounding area.

{¶40} Taylor presented no evidence to contradict or refute the prosecution testimony. Instead, he attempted to attack Snodgrass' credibility. While cross-examining her, Taylor asked why her current testimony regarding how long they had lived together was inconsistent with prior statements, pointing out the different times she had given. He asked why she lied to her parole officer as to where she lived. He also asked whether she had a prior theft conviction. After Detective Neidemire testified, Taylor asked about the warning contained in Snodgrass's criminal background check.

{¶41} However, Snodgrass explained that the inconsistencies with her prior statements arose from her mental state at the time of the incident. She explained that she lied to her parole officer for fear of being sent to jail. She also admitted to the prior conviction. While Neidemire testified that the background check stated that Snodgrass should be approached with caution, he did not know who placed the warning in the file or why it was there.

{¶42} Taylor also attempted to attack Wogerman's credibility by asking about marijuana found at the residence and whether the porch was already mostly full when Snodgrass began removing her personal items. Wogerman explained why no charges arose from finding the marijuana, and stated that the porch was not mostly full when Snodgrass began moving out her belongings.

**{¶43}** After our review of the record, we cannot say that the jury lost its way when it chose to believe the prosecution testimony. While Taylor attempted to attack the credibility of the witnesses, especially Snodgrass, there was nothing on the record that would foreclose the jury from choosing to believe her testimony that they had lived together at the same address at the time of the altercation. As a result, we find that Taylor's conviction is not against the manifest weight of the evidence.

**{¶44}** Accordingly, the second assignment of error is overruled.

**{¶45}** Having found no error prejudicial to Taylor in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/jlr**