[Cite as *State v. Richardson*, 2015-Ohio-4708.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 14CA3671 |
| v. | : | DECISION AND JUDGMENT ENTRY |
| DONALD L. RICHARDSON, JR., | : | |
| Defendant-Appellant. | : | RELEASED: 11/10/2015 |

APPEARANCES:

Robert M. Johnson, Portsmouth, Ohio, for appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

Hoover, P.J.

{¶ 1} Appellant-defendant Donald L. Richardson Jr. ("Richardson") appeals his convictions and sentences from the Scioto County Common Pleas Court. A jury found Richardson guilty of one count of murder, one count of felonious assault, two counts of tampering with evidence, one count of gross abuse of a corpse, and one count of having weapons under a disability. Here on appeal, Richardson asserts four assignments of error: (1) the trial court erred when it denied his motion to suppress; (2) his convictions were against the manifest weight of the evidence and based on insufficient evidence; (3) the trial court erred by precluding the introduction of an exhibit that did not contain hearsay evidence and was otherwise relevant; and (4) the trial court committed cumulative errors which deprived him of a fair trial.

{¶ 2} After a review of the entire record, we overrule all of Richardson's assignments of error. Because we find that the judge that issued the search warrant had probable cause to issue the warrant, the trial court did not err when it overruled Richardson's motion to suppress the evidence found as a result of the search. We also find that Richardson's convictions were not against the manifest weight of the evidence and were based on sufficient evidence. In addition, the trial court's exclusion of a report regarding a police interview with Richardson did not result in prejudice to Richardson; thus, the trial court did not err in sustaining the objection of the state of Ohio ("State") to the report's admission. Because we find that the trial court did not commit multiple errors, Richardson cannot prevail upon an argument based on the cumulative error doctrine. Consequently, we affirm the judgment of the trial court.

## I. Facts and Procedural Posture

{¶ 3} On April 29, 2014, the Scioto County Grand Jury indicted Richardson on five charges stemming from the 2011 death of Donald Kidd ("Kidd"). The Scioto County Grand Jury later filed a superseding indictment. In the superseding indictment, Richardson was indicted on one count of murder, in violation of R.C. 2903.02[1], with a firearm specification, in violation of R.C. 2941.145(A) and a repeat violent offender specification, in violation of R.C. 2941.149(A); one count of felonious assault, a second degree felony, in violation of R.C. 2903.11(A)(2), with a firearm specification, in violation of R.C. 2941.145(A) and a repeat violent offender specification, in violation of R.C. 2941.149(A); two counts of tampering with evidence, third

---

[1] The superseding indictment alleged that "***[Richardson], unlawfully, did cause the death of Donald Richard Kidd, as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: Felonious Assault, 291311(A)(2) in violation of Section 2903.02 of the Revised Code. [sic] in violation of R.C. 2903.02(B), R.C. 2903.02(D), R.C. 2903.02(A)". On October 21, 2014, upon the State's motion, the trial court entered a judgment correcting the indictment to read from "Felonious Assault, 2913.11(A)(2) to Felonious Assault 2903.11(A)(2)."

degree felonies, in violation of R.C. 2921.12(A)(1); one count of gross abuse of a corpse, a fifth degree felony, in violation of R.C. 2907.01(B); and one count of having weapons while under disability, a third degree felony, in violation of R.C. 2923.13(A)(2).

{¶ 4} In the early morning hours of May 9, 2011, the Portsmouth Fire Department and the Portsmouth Police Department responded to a report of an explosion in the area of the 1000 block of 15th Street, Portsmouth, Ohio. Upon arrival, law enforcement found a vehicle on fire in an alley. After fire crews put out the fire, the responders on the scene observed a body inside the car wrapped in a blanket. Investigators found a wallet in the vehicle and identified the body as Donald Kidd. The coroner performed an autopsy and medical examination and determined the cause of Kidd's death to be a gunshot wound to the head.

{¶ 5} Later that year, investigators received notice that DNA evidence from the crime scene had been matched with someone in the Combined DNA Index System ("CODIS"). Richardson's DNA matched some DNA from the crime scene. Shortly thereafter, investigators interviewed Richardson and obtained a DNA sample from him. An Ohio Bureau of Criminal Investigation ("BCI") report from December 2011 stated that DNA profiles from swabs of a gas can and a matchbox found at the crime scene were a mixture of at least two individuals and were consistent with contributions from Kidd and Richardson. Law enforcement continued their investigation; they did not charge Richardson at that time.

{¶ 6} In January 2014, Lieutenant Detective Michael J. Hamilton ("Hamilton") took over the investigation of Kidd's death. Because he had dealt with Richardson on a prior domestic violence incident, Hamilton knew Richardson had an ex-girlfriend by the name of Hazel Hodge ("Hodge"). Hodge told Hamilton that Richardson had another ex-girlfriend by the name of "Jamie". After further investigation, Hamilton learned that the other ex-girlfriend was Jamie

Ewing ("Ewing"). Both Hodge and Ewing told Hamilton about incriminating statements that Richardson had made during their respective relationships. According to both Hodge and Ewing, Richardson told them that he had killed a man and burned him in a car. With the DNA evidence and the statements of Hodge and Ewing, Hamilton sought and obtained a search warrant of Richardson's residence at 920 George Street, Portsmouth, Ohio.

{¶ 7} Police executed the search warrant of Richardson's residence and discovered a bullet and a bullet hole in the shower surround of Richardson's bathroom. Investigators collected a cutout portion of drywall from behind the shower surround, with a suspected bullet hole, the shower surround itself, the bullet from the wall cavity between the bathroom and a bedroom, and a cutout portion of drywall from the bedroom, with a suspected bullet strike.

{¶ 8} At arraignment, Richardson entered a not guilty plea to all of the charges. On June 3, 2014, Richardson filed a motion to suppress all evidence seized during the search of his residence. The trial court held a hearing on the motion to suppress on September 16, 2014. Hamilton testified at the hearing. The trial court also heard arguments of counsel on the motion to suppress. The trial court then denied Richardson's motion to suppress.

{¶ 9} Next, the trial court held a three-day jury trial on October 20, 2014 through October 22, 2014. The jury returned guilty verdicts on all the counts of the superseding indictment. On October 28, 2014, the trial court sentenced Richardson. For count one of murder, the trial court sentenced Richardson to 15 years to life with an additional three years for the gun specification. The trial court merged count two, felonious assault, with the murder conviction. For counts three and four, both of which were tampering with evidence, the trial court sentenced Richardson to three years on each count to be served consecutively. The trial court found that count five, abuse of a corpse, would merge with count three, tampering with evidence. For count six, having

weapons while under disability, the trial court sentenced Richardson to one year. The trial court

ordered all the sentences to run consecutively with one another for an aggregate total of 25 years

to life in prison.

{¶ 10} On November 19, 2014, Richardson filed this timely appeal.

## II. Assignments of Error

{¶ 11} Richardson presents the following assignments of error for our review:

Assignment Of Error No. 1:

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S
MOTION TO SUPPRESS EVIDENCE, AS THE AFFIDAVIT FOR SEARCH
WARRANT RELIED UPON BY THE ISSUING JUDGE DID NOT SPEAK TO
THE CREDIBILITY OR RELIABILITY OF THE INDIVIDUALS PROVIDING
THE INFORMATION.

Assignment Of Error No. 2:

DEFENDANT'S CONVICTIONS FOR MURDER, FELONIOUS ASSAULT,
TAMPERING WITH EVIDENCE, GROSS ABUSE OF A CORPSE, AND
WEAPON UNDER DISABILITY WERE AGAINST THE MANIFEST
WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

Assignment of Error No. 3:

THE TRIAL COURT ERRED IN SUSTAINING THE STATES [SIC]
OBJECTION TO THE INTRODUCTION OF THE SUPPLEMENTAL REPORT
AS AN EXHIBIT BECAUSE THE EXHIBIT DID NOT CONTAIN HEARSAY
EVIDENCE AND WAS OTHERWISE RELEVANT.

Assignment of Error No. 4:

CUMULATIVE ERRORS COMMITTED DURING APPELLANT'S TRIAL
DEPRIVED HIM OF A FAIR TRIAL AND REQUIRE A REVERSAL OF HIS
CONVICTIONS.

## III. Law and Analysis

**A. Assignment of Error No. 1**

{¶ 12} In his first assignment of error, Richardson argues that the trial court erred when it overruled his motion to suppress the evidence collected during a search of his residence. Richardson asserts that the basis of the informants' (Hodge and Ewing) knowledge was not what they actually saw or experienced but rather what they were allegedly told by Richardson. Richardson asserts that Hodge and Ewing had absolutely no personal knowledge of any facts that were used to support the warrant. Thus, Richardson contends that the basis for the knowledge Hodge and Ewing had was "shaky" and should not have supported a finding of probable cause. Richardson also argues that the State failed to present sufficient facts to establish the reliability of the information supplied by Hodge and Ewing. Therefore, Richardson contends that the search warrant was defective; and probable cause did not exist to issue the warrant.

{¶ 13} The State argues in response that the affidavit in support of the search warrant cited multiple sources of information supporting probable cause for the search of Richardson's home. The State contends that the crime scene evidence containing Richardson's and Kidd's DNA and the witness statements from Hodge and Ewing demonstrate a substantial basis for the court's finding of probable cause. Further, the State argues that although Hodge and Ewing were first time informants with no specific evidence to demonstrate their reliability, they corroborated each other and the already present DNA evidence. Lastly, the State asserts that even if the warrant was lacking probable cause, the good faith exception to the exclusionary rule applies. The State contends that the investigating officer acted in good faith.

{¶ 14} Our review of a trial court's decision on a motion to suppress presents a mixed question of law and fact. *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100, citing *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When

considering a motion to suppress, the trial court acts as the trier of fact and is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Accordingly, we defer to the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Landrum*, 137 Ohio App.3d 718, 722, 739 N.E.2d 1159 (4th Dist.2000). Accepting those facts as true, we must independently determine whether the trial court reached the correct legal conclusion in analyzing the facts of the case. *Roberts* at ¶ 100, citing *Burnside* at ¶ 8.

{¶ 15} "A neutral and detached magistrate may issue a search warrant only upon the finding of probable cause." *State v. Gilbert,* 4th Dist. Scioto No. 06CA3055, 2007-Ohio-2717, ¶ 13, citing *United States v. Leon*, 468 U.S. 897, 914-915, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); Crim.R. 41(C). An affidavit in support of a search warrant must "particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located." Crim.R. 41(C).

{¶ 16} "When reviewing a request for a search warrant, the issuing magistrate or judge must 'make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. Gannon*, 4th Dist. Lawrence No. 14CA16, 2015-Ohio-1573, ¶ 24, citing *State v. George,* 45 Ohio St.3d 325, 544 N.E.2d 640, (1989), paragraph one of the syllabus, quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Considering the totality of the circumstances, 'so long as the magistrate had a "substantial basis for ... conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.' " *State v. Eldridge*, 4th Dist. Scioto No. 11CA3441,

2012-Ohio-3747, ¶ 13, citing *Gates* at 236, quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697(1960). "The reviewing court 'should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.' " *Id.* " '[T]his standard of review is more deferential than that review we engage in other contexts involving a motion to suppress.' " *State v. Ralston*, 4th Dist. Highland No. 10CA6, 2011-Ohio-3552, ¶11, quoting *State v. Goddard*, 4th Dist. Washington No. 97CA23, 1998 WL 716662 (Oct. 2, 1998), fn. 2.

{¶ 17} "In applying the *Gates* 'totality-of-the-circumstances' test, the official issuing a warrant must still consider the veracity and basis of knowledge of informants who supply the underlying information for the affidavit." *State v. Westbrook*, 4th Dist. Scioto No. 09CA3277, 2010-Ohio-2692, ¶ 24, citing *Goddard* at *4, citing *Gates* and *George*. " 'However, an affidavit lacking in these areas is not automatically insufficient to procure the issuance of a search warrant.' " *Id.*, quoting *Goddard* at *4, citing *Gates* at 230. "[A] deficiency in one area may be overcome by 'other indicia of reliability.' " *Id.*, quoting *Goodard* at *4, citing *Gates* at 233.

{¶ 18} The search warrant here sought to search the property at 920 George Street, Portsmouth, Ohio. As the affiant, Hamilton provided the facts tending to establish the grounds for the issuance of the search warrant. Hamilton attested that the investigation of the burnt vehicle recovered a matchbox and a gas can. Hamilton stated that the DNA profiles taken from the matchbox and gas can had a mixture of at least two individuals, Kidd and Richardson. In the affidavit, Hamilton also described the statements of Hodge and Ewing. Hamilton wrote that Hodge told him that Richardson once told her "he [Richardson] would kill her [Hodge] like he killed the guy in the car and burnt him up."

{¶ 19} Hamilton provided lengthier details regarding Ewing's statement. Ewing told Hamilton about different statements Richardson made to her regarding his involvement in Kidd's death. According to Ewing, Richardson told her that he shot Kidd in the bathroom of his residence and dragged the body outside and into Kidd's vehicle. Richardson also told Ewing that he lit the vehicle on fire and fled the scene. The affidavit also stated that Richardson told Ewing that he used a gas can to set the fire and he dropped the matchbox in the area of the burning car. Ewing also stated that Richardson told her that he hid the gas can in a trash can in the area. According to Ewing, Richardson came to her residence at about 2:00 a.m. on May 9, 2011, with an obvious broken arm and dried blood on his hands. Ewing stated that Richardson was later concerned because the matchbox and the gas can were already gone from the area. Ewing also stated that Richardson told her he broke his arm jumping off a train he hopped onto and rode home from the scene of the burning vehicle. Ewing also told Hamilton that Richardson went back to his residence at 920 George Street and cleaned up all the blood.

{¶ 20} In the affidavit, Hamilton also attested that Ewing was shown a picture depicting a piece of the bed clothing in which Kidd's body had been wrapped. Ewing identified the picture as being bed clothing Richardson had owned. Finally, Ewing stated that Richardson told her that he wrapped the firearm that he used to kill Kidd in some bloody clothing and proceeded to throw it into a storm sewer in the area of George Street and Argonne Avenue. As a result of the affidavit, a judge signed and issued the search warrant.

{¶ 21} Hamilton testified at the hearing on Richardson's motion to suppress. Hamilton testified that the statements of Hodge and Ewing corroborated the other evidence in the case. Testifying specifically about Ewing's statement, Hamilton stated that Ewing corroborated surveillance camera video footage showing a suspect lighting fire to the car and fleeing the

scene. Hamilton also testified that medical records showing Richardson suffered a broken arm corroborated what Ewing had told him. On cross-examination, Hamilton testified that the two women had horrible relationships with Richardson because they were scared of him. Hamilton also testified that he first encountered Richardson and Hodge when he responded to a domestic violence related incident involving the two. Hamilton acknowledged that he knew Ewing had a criminal record. Hamilton also acknowledged that he suspected Hodge of being a drug user and that he knew Hodge had filed numerous protection orders against Richardson.

{¶ 22} It is Richardson's contention that Hodge and Ewing had no personal knowledge of any of the facts used to support the warrant, only the second hand accounts of events that were communicated to them during "rocky" relationships. While it is true that Hodge and Ewing provided statements that were based upon hearsay, that fact is not detrimental to a finding of probable cause. *See Ralston*, 2011-Ohio-3552, at ¶ 15, quoting *State v. Richardson*, 4th Dist. Ross No. 08CA3022, 2009-Ohio-923, ¶ 10 (" 'The fact that an affiant's knowledge may be the result of double or multiple levels of hearsay does not, per se, invalidate the resulting search warrant.' "); Crim.R. 41(C)(2) ("The finding of probable cause may be based upon hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished.")

{¶ 23} Here, the informants' basis of knowledge is that both of them were ex-girlfriends of Richardson. It is true that most of the information that Ewing provided to Hamilton were statements purportedly made by Richardson. However, Ewing also provided details that she witnessed the night of May 9, 2011. For example, Ewing told Hamilton that Richardson arrived at her house at 2:00 a.m. that morning with a broken arm and dried blood on his hands. Ewing also identified bed clothing that was wrapped around Kidd's body as belonging to Richardson.

Therefore, while much of the information Ewing told Hamilton were hearsay statements made by Richardson, Ewing also provided evidence based upon her personal observations.

{¶ 24} Richardson also contends that the State did not establish the reliability of the informants' information. The Ohio Supreme Court has explained: "***that an identified citizen informant may be highly reliable and, therefore, a strong showing as to the other indicia of reliability may be unnecessary***." *Maumee v. Weisner*, 87 Ohio St.3d 295, 300, 720 N.E.2d 507 (1999). Hodge and Ewing were "identified citizen informants." The statements of Hodge and Ewing corroborated one another. Both provided Hamilton information regarding Richardson's statements about someone he killed and burned in a car. The DNA evidence linking Richardson to the gas can and matchbox found at the scene of the burning vehicle also provided corroboration of the informants' statements. This corroboration and Ewing's detailed statement formed the basis that evidence pertaining to the investigation of Kidd's death would be found at 902 George Street.

{¶ 25} Examining the totality of the circumstances, including the basis of knowledge, veracity, and reliability of Hodge and Ewing, we find that there was a substantial basis for concluding that probable cause existed and issuing the warrant. Therefore, the trial court did not err in denying Richardson's motion to suppress. Richardson's first assignment of error is overruled.

## B. Assignment of Error No. 2

{¶ 26} In his second assignment of error, Richardson asserts that his convictions were against the manifest weight of the evidence and based upon insufficient evidence. Richardson argues that the evidence simply does not support his convictions. In support of his argument, Richardson asserts the following: (1) the State presented no direct evidence that placed him at

the scene of the crime; (2) the State never provided any evidence regarding a murder weapon; (3) the bullet found in his residence did not have any traces of DNA on it and; (4) the State went forward with a prosecution based on the statements of two disgruntled ex-girlfriends, who had no personal knowledge of the events in question.

{¶ 27} On the other hand, the State contends that direct and circumstantial evidence sufficiently proved the case against Richardson and that the jury did not lose its way. In support of its argument, the State asserts the following: (1) DNA evidence showed a mixture of the victim's and Richardson's DNA on the matchbox and the gas can; (2) video evidence showed a person lighting matches near the car prior to an explosion of fire and a person running to the alley where the match box and can were found; (3) the two ex-girlfriends heard Richardson talk about what he had done; (4) the testimony of Ewing was corroborated by medical records from the day after the murder showing Richardson did in fact have a broken arm and by the bullet and bullet hole recovered from Richardson's bathroom; (5) Ewing provided detail about the incident that was not released to the public and; (6) Ewing saw Richardson at her residence the night of the murder with blood on his hands.

{¶ 28} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt." *State v. Davis,* 4th Dist. Ross No. 12CA3336, 2013–Ohio–1504, ¶ 12. "The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the

offense beyond a reasonable doubt." *Id.,* citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Therefore, when we review a sufficiency of the evidence claim in a criminal case, we review the evidence in a light most favorable to the prosecution. *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶ 29} " 'Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.' " *State v. Topping,* 4th Dist. Lawrence No. 11CA6, 2012–Ohio–5617, ¶ 60, quoting *Thompkins* at 387. "When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses." *Id.* "The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve." *Id.*, citing *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001), and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. This is so because "[t]he trier of fact 'is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Pippen,* 4th Dist. Scioto No. 11CA3412, 2012–Ohio–4692, ¶ 31, quoting *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 30} "Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in

evidence, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Quotations omitted.) *Davis* at ¶ 14.

{¶ 31} If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493, ¶ 16 (4th Dist.). A reviewing court should find a conviction against the manifest weight of the evidence " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *see also State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 32} Richardson was convicted of all six counts in the superseding indictment against him. Count one was murder in violation of R.C. 2903.02(A), (B) and (D). R.C. 2903.02 states:

>  (A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.
>
>  (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
>
>  ***
>
>  (D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

{¶ 33} Count two was felonious assault in violation of R.C. 2903.11(A)(2), which states:

(A) No person shall knowingly do either of the following:

(2) Cause or attempt to cause physical harm to another or to another's unborn by

means of a deadly weapon or dangerous ordnance.

{¶ 34} A firearm specification, in violation of R.C. 2941.145(A), was attached to counts

one and two of the indictment. R.C. 2941.145(A) states:

Imposition of a three-year mandatory prison term upon an offender under division

(B)(1)(a) of section 2929.14 of the Revised Code is precluded unless the

indictment, count in the indictment, or information charging the offense specifies

that the offender had a firearm on or about the offender's person or under the

offender's control while committing the offense and displayed the firearm,

brandished the firearm, indicated that the offender possessed the firearm, or used

it to facilitate the offense.

"Admission into evidence of the firearm allegedly employed in the crime is not necessary to

establish the specification." *State v. Gaines*, 46 Ohio St.3d 65, 69, 545 N.E.2d 68 (1989). "Rather,

the fact may be established by circumstantial evidence (testimony as to gunshots, smell of

gunpowder, bullets or bullet holes, etc.)". *Id*.

{¶ 35} Counts three and four were tampering with evidence, one count concerning the

firearm and blood evidence and the other concerning the body of Kidd, in violation of R.C.

2921.12(A)(1), which states:

(A) No person, knowing that an official proceeding or investigation is in progress,

or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with

purpose to impair its value or availability as evidence in such proceeding or

investigation[.]

{¶ 36} Count five was gross abuse of a corpse, in violation of R.C. 2927.01(B), which states: "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." Lastly, count six was having weapons while under disability in violation of R.C. 2923.13(A)(2), which states:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

{¶ 37} At trial, the State presented 16 witnesses during its case in chief. Richardson did not call any witnesses. The trial testimony revealed the following facts. At around 1:00 a.m., on May 9, 2011, law enforcement responded to reports of a fire and an explosion between 14th and 15th Streets in Portsmouth, Ohio. Upon arrival, law enforcement found a car on fire. After the fire was extinguished, first responders found a body in the backseat of the burnt vehicle. Investigators identified the body from a wallet found in the vehicle as Kidd.

{¶ 38} Various law enforcement officers testified to the discovery, collection, and analysis of the evidence found at the crime scene. Fire marshals determined that the fire began in the back of the car. Kidd's body was discovered in the back seat wrapped up in a blanket and a comforter. Investigators searched the outer area of the scene to discover a trail of matches and a matchbox. They also discovered a gas can in a nearby public trashbin. Forensic analysis later

revealed that DNA profiles from swabs of the matchbox and gas can were consistent with contributions from Kidd and Richardson.

{¶ 39} Dr. Robert Sharpe performed the autopsy on Kidd's body and testified at trial. Dr. Sharpe testified that Kidd suffered lacerations over multiple parts of his head. These injuries were described as resulting from blunt force trauma. Dr. Sharpe testified that Kidd suffered a gunshot wound with an entrance by the left temple and exit out the right back of the head. The bullet went completely through the skull. According to Dr. Sharpe, the injuries to the head, scalp, the lower lip and behind the left ear occurred prior to death. Dr. Sharpe testified that the cause of Kidd's death was a gunshot wound to the head.

{¶ 40} Donald Stephenson, a locksmith at Steve's Lock and Key, also testified at trial. Steve's Lock and Key is a local business located on the corner of 15th Street and Findlay, near where police responded to the burning vehicle. The business is equipped with six surveillance cameras. When Stephenson arrived to work on May 9, 2011, the police discussed obtaining a copy of the business's surveillance video. Stephenson pulled the pertinent portion of the video and gave it to investigators. Stephenson testified that he, along with police, were unable to identify the person seen on the video.

{¶ 41} Investigator Jamie Stewart from the State Fire Marshal's Office described the events captured on the surveillance video. Stewart testified that the video showed a car pull in beside Steve's Lock and Key. The car then navigated through the nearby alleys and streets before coming to rest in a grassy area. Next, light flashes and the video shows the explosion of the vehicle. Stewart testified that through the fireball, an individual can be seen running from the scene towards 16th Street.

{¶ 42} During the initial investigation, investigators interviewed a witness named

Michael Stamper. Captain Chris Lowery of the Portsmouth Fire Department testified that Stamper saw the explosion and a person running down nearby alleys. A sketch artist created a sketch of a potential suspect through Stamper's information. Investigators also conducted two photo lineups with Stamper. Richardson was not included in either photo lineup. Stamper did not identify any photo in either lineup as the perpetrator. Lowery also testified that the sketch of the suspect was just one of many different descriptions Stamper provided to police.

{¶ 43} The two ex-girlfriends of Richardson, Hodge and Ewing, were two of the State's key witnesses. Hodge testified that she dated Richardson in 2013. During an argument, Hodge testified that Richardson told her "That I [Hodge] was going to end up like the guy it-- he shot and burnt." Hodge added that Richardson referred to the guy as "the guy down by the Ville***." Hodge testified that this particular statement came up when the two were getting high and fighting. Hodge also testified about other fights with Richardson. Hodge stated that she filed multiple police reports on Richardson, as well as a temporary restraining order. Hodge revealed that during one confrontation, Richardson and she slashed each other's tires. On cross-examination, however, Hodge testified that Richardson never hit her or raised a hand to her.

{¶ 44} Similar to her statement that helped comprise Hamilton's affidavit in support of the search warrant, Ewing's testimony was extensive about what Richardson had told her about the alleged crime. Ewing testified that Richardson and she dated for eight years. Ewing testified that on May 8, 2011, Richardson took her and her two children to eat pizza at 2:00 p.m. After eating, they returned to Ewing's house. Ewing testified that when she used the computer, Richardson became upset at her and left the house. After midnight, on May 9, 2011, Richardson arrived at Ewing's house needing to talk to her, that it "was important, that he was in trouble." Richardson told Ewing he could not tell her what had happened. Ewing stated that his arm was

visibly broken and he had blood on his hands. According to Ewing, Richardson said "he was sparring and hitting a * * * heavy bag and it had fallen and the chain had broke his arm."

{¶ 45} Later that same night, Richardson told Ewing that he was going back home "[t]o clean up a mess." Ewing added that he told her he had to clean up a bloody mess. Ewing also stated that Richardson had stuffed everything he used to clean up, including the gun he used to shoot the man, down a manhole. Ewing testified that later in the day, Richardson and she went to Southern Ohio Medical Center's emergency room. Richardson sought treatment for his broken arm. Two days later, Richardson provided more information to Ewing regarding the incident. Ewing testified that Richardson told her that he got into an argument with an old friend and "***that he had put him in the bathtub and shot him in the back of the head." Ewing testified that Richardson referred to Kidd as an old friend. Ewing stated that she had not heard of Kidd before but vaguely remembered Richardson mention an older white man from Ashland or Ironton. Ewing testified that, according to Richardson, the fight took place at Richardson's house on George Street. Next, Ewing stated that Richardson told her he poured gasoline on the car, poured it on the guy, and lit a match. Richardson said that when he did that it blew him back and he lost his hat. Ewing testified that Richardson stated that he rode a train back to George Street afterwards. According to Ewing, Richardson told her that he jumped off the train and fell with all his weight on his arm.

{¶ 46} Ewing also identified the comforter that Kidd had been wrapped up in as belonging to Richardson. The State also asked Ewing about a conversation she had with Hodge on Facebook. Ewing testified that while she did communicate with Hodge on Facebook, they did not talk about anything related to this incident. Ewing also testified that she did not come forward with information sooner because Richardson had threatened her. According to Ewing,

Richardson looked across the room at her grandson and her daughter and told her that if she wanted to see them grow up that she would keep her mouth shut.

{¶ 47} On cross-examination, Ewing revealed that Richardson never hit her; but he did threaten her with physical violence. Also, Ewing testified that she did not go to police earlier because she was afraid of Richardson. Ewing also admitted that she had a previous conviction for credit card fraud. Ewing and Richardson broke up in March of 2012. Ewing moved to Indiana on August 29, 2012.

{¶ 48} Dr. Thomas Carter, an emergency medicine physician at Southern Ohio Medical Center in Portsmouth, Ohio, testified to Richardson's visit to the emergency room for treatment of his broken arm. Richardson sought medical attention on May 9, 2011, complaining of left forearm and hand pain. Dr. Carter testified that Richardson suffered a fracture of the distal metaphysis of the radius, the end of the long bones of the arm. Dr. Carter further testified that a named fracture in the wrist or something like that is usually from a fall and an outstretched hand. On cross-examination, Dr. Carter stated that he found an old fracture as well as the new one. Dr. Carter testified that he did not notice any burn marks on Richardson's injured hand.

{¶ 49} BCI Special Agent Shane Hanshaw testified to two searches he conducted during this investigation. First, on May 10, 2011, Hanshaw searched the remnants of the burnt car. He collected various swabs of the vehicle in an effort to discover fingerprints or DNA evidence. Hanshaw testified that his search of the car yielded no evidence useful in this case. Hanshaw's second search was the search of Richardson's residence at 920 George Street. Local investigators called Hanshaw before executing the search warrant. Investigators informed Hanshaw that the bathroom was an area where evidence might be found.

{¶ 50} Hanshaw first noticed multiple areas of imperfections on the shower surround.

Hanshaw observed one particular imperfection that he believed looked like it had been patched. Next, Hanshaw pulled the surround off the wall and noticed what appeared to him as a bullet hole located in the drywall. Hanshaw removed the section of the bathroom drywall containing the bullet hole. Hanshaw noticed the drywall material was beveling on the other side. Hanshaw testified that this demonstrated that a projectile entered into the bathroom drywall and exited the other side.

{¶ 51} Upon removal of the section of bathroom drywall, Hanshaw noticed a strike mark on the interior surface of the adjacent bedroom drywall. Hanshaw then searched the bedroom wall and found visual evidence that the wall had been patched. Hanshaw then cut out a portion of the drywall from the bedroom wall. On that portion of the bedroom drywall, Hanshaw was able to observe a strike mark.

{¶ 52} Next, Hanshaw cut out another portion of the bedroom drywall, lower near the floor, in an effort to examine inside the wall cavity. Hanshaw found a copper jacketed bullet lying on the floor of the wall cavity. Hanshaw's search of the residence at 920 George Street therefore yielded four important pieces of evidence: (1) a cutout portion of the bathroom drywall with a suspected bullet hole, (2) the shower surround with a suspected bullet hole, (3) a cutout portion of the bedroom drywall with a suspected bullet strike, and (4) a bullet found in the wall cavity between the bathroom and bedroom. These items underwent DNA analysis. On cross-examination, Hanshaw admitted that his search of the bathroom floor did not reveal any blood evidence. Also, Hanshaw's search of the nearby sewers did not recover a firearm.

{¶ 53} At trial, Hamilton testified regarding his investigation that led to Richardson being the main suspect in Kidd's death. In January 2014, Hamilton took the lead in investigating this homicide. Hamilton cited the mixture of Richardson and Kidd's DNA on the matchbox and gas

can as the reason he began to investigate Richardson. Hamilton testified that he knew Hodge was Richardson's ex-girlfriend from a prior occasion when he dealt with both of them during a domestic violence incident. Hamilton stated that Hodge gave him the first name of another ex-girlfriend, Ewing. Hamilton then testified how he was able to corroborate Hodge and Ewing's information. Hamilton described holdback evidence, which is evidence that is not released to the public through media outlets. Hamilton testified that Ewing did not know about the gas can or matchbox when she mentioned those items to him. Hamilton testified that this lends credibility to a witness. Hamilton also testified that Ewing revealed that Richardson broke his arm in the process of jumping off the train. Hamilton testified that the medical records from Southern Ohio Medical Center corroborated her statements. After gathering information from Hodge and Ewing, Hamilton sought a search warrant to be executed at the residence at 920 George Street.

{¶ 54} Hamilton also testified regarding Richardson's past convictions. In 1984, Richardson was convicted of robbery in two separate cases. As a result of the convictions, Richardson was placed under a weapons disability. On cross-examination, Hamilton testified that no gun used in the death of Kidd was located.

{¶ 55} Also on cross-examination, Hamilton discussed the DNA and forensic analysis of several pieces of collected evidence. Defense counsel also asked Hamilton to review multiple BCI reports on the collected evidence. Hamilton confirmed that Richardson's DNA was found on the gas can and matchbox. Hamilton testified that neither Richardson's nor Kidd's DNA was found on the bullet recovered from the police search of the residence at 920 George Street. Also, the DNA of neither of the individuals was found on the cutout portions of drywall. BCI's analysis of the gas can and matchbox did not reveal any latent fingerprints. BCI's analysis of fingernail scraping from Kidd did not reveal any DNA evidence. BCI's analysis of various swabs

and items from Hanshaw's search of the burnt car did not recover any DNA profile. BCI's analysis of swabbings of the blanket, bed cover, and the rope recovered from the burnt car revealed only Kidd's DNA profile.

{¶ 56} The State also called Joe Salyers, the owner of the residence at 920 George Street, to testify. Salyers testified that he owned the property for approximately five years. Salyers and Richardson entered into a rental agreement on November 1, 2010. Salyers testified that generally before he rented a residence he would walk through the house and check for any major damages beyond normal wear and tear. Salyers testified that he did not recall any damage to the bathroom area when he rented the property to Richardson. The State showed Salyers pictures of the aftermath of the police search of the bathroom, including the suspected bullet hole in the bathroom and the patch on the bedroom wall. Salyers testified that he did not recall the damage to the rooms. Salyers stated that it was possible that it could have been there and he did not notice.

{¶ 57} The breadth of Richardson's argument under this assignment of error is that the State produced no concrete, direct evidence of his involvement in Kidd's death, only the secondhand accounts of two disgruntled ex-girlfriends. However, the weight to be afforded evidence and the credibility of testimony are issues to be determined by the trier of fact. *State v. Frazier*, 73 Ohio St.3d 323, 339, 652 N.E.2d 1000 (1995), citing *Grant*, 67 Ohio St.3d at 477, 620 N.E.2d 50. As stated above, the fact finder "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.*, 10 Ohio St.3d at 80, 461 N.E.2d 1273. Here, both the State and defense counsel fully examined both Hodge and Ewing regarding their testimony and their relationships with Richardson. Thus, the jury had ample testimony to

determine their credibility as well as all the other witnesses in this case and weigh it accordingly and we will not substitute our judgment for that of the jury.

{¶ 58} The State presented both direct and circumstantial evidence in their case against Richardson. Hodge and Ewing revealed statements made by Richardson incriminating him as responsible for Kidd's homicide. Specifically, Ewing's testimony revealed that Richardson told her poignant details about how he killed Kidd at his residence at 920 George Street and then burned the body in Kidd's vehicle. Ewing's testimony also revealed details about how Richardson cleaned up a bloody mess and how he disposed of those materials, including the firearm he used to kill Kidd. The DNA evidence found on the matchbox and gas can linking Richardson to the scene of the burning car further corroborates Ewing's testimony. The evidence recovered at Richardson's residence demonstrates that a shooting took place in his bathroom.

{¶ 59} In light of the above evidence, we conclude that Richardson's convictions for the above crimes were not against the manifest weight of the evidence. We cannot say that this is an exceptional case where the evidence weighs heavily against the convictions, that the trier of fact lost its way, or that a manifest miscarriage of justice has occurred. Further, we conclude that substantial evidence existed upon which the jury could have reasonably concluded that all the essential elements of the crimes charged had been proved beyond a reasonable doubt. Therefore, we find that Richardson's convictions were also based upon sufficient evidence. Richardson's second assignment of error is overruled.

## C. Assignment of Error No. 3

{¶ 60} In his third assignment of error, Richardson argues that the trial court erred when it sustained the State's objection to the introduction of an exhibit. The exhibit in question was a supplemental report regarding a police interview of Richardson. The author of the report was the

Chief of Investigation for the State Fire Marshal's office, Joshua Hobbs. Defense counsel tried to introduce the report during his cross-examination of Hamilton, but the State objected. Richardson contends that the evidence was relevant. Richardson also argues that the introduction of the report was not to prove the truth of any of his statements contained in the report. Richardson asserts that the report was going to be used to determine if investigators had asked Richardson about his whereabouts on the night of the crime. Richardson argues that introduction of the report was an effort to show the inconsistencies between what Hamilton testified to on the stand and what was actually in the report.

{¶ 61} The State argues that Richardson was attempting to introduce his statement to police in contravention to Evid.R. 801. The State contends that it is unclear what inconsistencies were present and how they would be relevant to the case. The State asserts that this was a clever attempt by trial counsel to introduce hearsay evidence.

{¶ 62} "A trial court has broad discretion in the admission or exclusion of evidence, and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to defendant." *State v. Green,* 184 Ohio App.3d 406, 2009–Ohio–5199, 921 N.E.2d 276, ¶ 14 (4th Dist.) Absent an abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence. *State v. Linkous*, 4th Dist. Scioto No. 12CA3517, 2013–Ohio–5853, ¶ 22, citing *State v. Martin,* 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). To constitute an abuse of discretion, the trial court's decision must be unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

The relevant testimony for analysis of this assignment of error was as follows:

[Defense counsel:] Okay. Now you interviewed Mr. Richardson, didn't you? Not

you, but the police department did do interviews of him; is that correct?

[Hamilton:] Yes, sir.

[Defense Counsel:] And did you review those interviews?

[Hamilton:] Yes, sir.

[Defense Counsel:] Did they ever ask him where he was that night?

[Hamilton:] I believe so.

[Defense Counsel:] Okay. And would that have been in the report?

[Hamilton:] I don't know if it would have been relayed down to the paper report

or not.

Richardson's trial counsel then attempted to introduce a report on the interview that police

conducted with Richardson. During the bench conference after the State's objection,

Richardson's trial counsel stated: "No. I'm not concerned about what he [Richardson] said. I'm

concerned about what they asked him. I mean, that could be redacted, whatever he said."

Richardson's trial counsel later proffered that the report had no indication, whatsoever, that

Richardson was asked about his whereabouts on that particular evening.

{¶ 63} "Relevant evidence" means evidence having any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence. Evid.R. 401. Throughout his cross-examination,

Richardson's defense counsel questioned Hamilton about what led him to investigate

Richardson. He asked Hamilton about Hodge and Ewing's statements, the evidence that

corroborated their statements, and in general all the evidence linking Richardson to Kidd's

homicide. "***Ohio courts have previously found that evidence relating to the police's

investigation of a criminal defendant is relevant and admissible." *State v. Barnett*, 3rd Dist.

Logan No. 8-12-09, 2013-Ohio-2496, ¶ 32, citing *State v. Trent,* 5th Dist. Stark No.

2004CA00360, 2005–Ohio–5793, ¶ 18 (implicitly finding that police officer's testimony was

admissible since it "was offered merely to explain police investigative behavior"); *State v.*

*Bailey,* 8th Dist. Cuyahoga No. 81498, 2003–Ohio–1834, ¶ 27–29 (implicitly finding that police

officer's testimony regarding the investigation of the defendant was relevant since it "was

necessary to explain" events leading to the defendant's arrest); *State v. Payne,* 8th Dist.

Cuyahoga No. 66214, 1994 WL 581517 (Oct. 20, 1994) ("Such background information

[regarding the police's investigation] provides the jury with a view toward the setting of the case

and is relevant [to the charged crimes]."). Given the context of defense counsel's cross-

examination, we find that defense counsel's question was relevant. Thus, the report was

potentially relevant since defense counsel attempted to impeach or clarify Hamilton's answer.

{¶ 64} The trial court cited *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007,

824 N.E.2d 504 and Evid.R. 801 when it sustained the State's objection to the introduction of the

report. The trial court explained, "Here's the problem I have with it. First, the rule probably rules

against you, and the other problem is you've already indicated he's not taking the witness stand,

so this is basically him taking the witness stand and testifying without taking the witness stand."

Evid.R. 801(d)(2) states:

> (D) Statements which are not hearsay. A statement is not hearsay if:
>
> (2) *Admission by party-opponent*. The statement is offered against a party and is
>
> (a) the party's own statement, in either an individual or a representative
>
> capacity***

The Ohio Supreme Court in *Cunningham* stated:

Cunningham's pretrial statement is hearsay and does not fall within any exception to the hearsay rule. Although Cunningham's statement is that of a party opponent, Evid.R. 801(D)(2) by its terms applies only to statements offered *against* a party. See *In re Coy* (1993), 67 Ohio St.3d 215, 217–218, 616 N.E.2d 1105. A party may not introduce his own statement under Evid.R. 801(D)(2)(a). Id., citing Staff Note to Evid.R. 801(D)(2).

{¶ 65} Here, the trial court correctly excluded the report in order to prevent defense counsel from introducing Richardson's own pretrial statements. However, defense counsel insisted that he was not concerned about what Richardson said. Defense counsel even offered that Richardson's statements be redacted from the report. If the report was actually admitted in order to only determine if investigators asked Richardson where he was on the night in question, then the report may not have been introduced for the truth of the matter asserted. Thus, the report would not be considered hearsay. Evid.R. 801(C) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.") However, defense counsel could have used the report to refresh Hamilton's recollection pursuant to Evid.R. 612 and then repeated the question to Hamilton.

{¶ 66} Ultimately, even considering the forgoing, the judgment of the trial court may not be reversed absent prejudice to Richardson. Here, we do not find that Richardson suffered prejudice as a result of the report being excluded from the record. The State presented other significant evidence of Richardson's guilt through other admissible testimony. Therefore, even if we found the trial court erred in sustaining the State's objection to the admission of the report in question, the error would be harmless. Accordingly, we find that the trial court did not abuse its discretion. Richardson's third assignment of error is overruled.

**D. Assignment of Error No. 4**

{¶ 67} In his fourth assignment or error, Richardson asserts that cumulative errors deprived him of a fair trial. Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of [the] numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 68} "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Harrington,* 4th Dist. Scioto No. 05CA3038, 2006-Ohio-4388, ¶ 57, citing *State v. Goff,* 82 Ohio St.3d 123, 140, 694 N.E.2d 916 (1998). We have not found that the trial court committed multiple errors in this case. Therefore, the cumulative error doctrine is inapplicable here. Accordingly, Richardson's fourth assignment of error is overruled.

**IV. CONCLUSION**

{¶ 69} Having overruled all of Richardson's assignments of error for the reasons stated above, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earliest of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to the expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and McFarland, A.J.: Concur in Judgment and Opinion.

For the Court

By:_____
Marie Hoover, Presiding Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.